Edmonds vs. The State.

# EDMONDS VS. THE STATE.

1. GRAND JURY:   *List of, must be certified by jury commissioners.*
   If the jury commissioners fail to certify the list of grand jurors and alternates selected by them, as the law requires, the circuit court may quash the list and require the sheriff to summon others.

2. INDICTMENT.  MURDER: *Name of deceased and means of death unknown*
   An indictment is not bad on demurrer, or in arrest of judgment, because it states that the surname of the party killed is to the grand jurors unknown. But such allegation is material, and must be proved by the state on the trial; and also that the grand jury made due inquiry to ascertain the name.

   And so the averment that the defendant committed the crime at a place specified, "in some way and manner, and by some means, instruments, and weapons to the jurors unknown," is sufficient, when the circumstances of the case will not admit of greater certainty in stating the means of death.

3. MOTION FOR CONTINUANCE:   *Absence of counsel.*
   It is within the sound discretion of the presiding judge to grant or refuse a continuance on the ground of the unavoidable absence of the leading counsel in a cause, and unless it is made to appear that such discretion was abused to the prejudice of the party making the application, its refusal will not be ground for reversal in the supreme court.

4. EVIDENCE:   *Party contradicting his admissions in court.*
   A defendant stated in his motion for continuance, that certain absent witnesses would testify, if present, to certain facts.   The state, to avoid the continuance, admitted that the witnesses, if present, would testify as stated.   Afterwards, the court, against the objections of the defendant, permitted the state to introduce the witnesses, and prove by them the reverse of what it had admitted they would testify.   *Held,* That there was no error in this.

5. EVIDENCE:   *Counts in an indictment, not.*
   Counts in an indictment are mere pleadings, and can not be used as evidence on the trial.

6. SAME:   *Declaration of deceased: Res gestæ.*
   Where it was important to prove that the deceased had a peculiar tooth in the roof of her mouth, her declarations about it, when there could have been no *lis mota,* were admissible in evidence as *res gestæ.*

7. PRACTICE IN CIRCUIT COURT: *Reading law-book to jury.*

The reading a law-book to the jury in a criminal case by the defendant's counsel, is under the control and subject to the discretion of the circuit judge; and his refusal to allow it, will not be held error here, where there is nothing to show that the discretion was abused.

8. MOTION FOR NEW TRIAL: *General assignments of error.*

A general assignment in a motion for new trial, "that the court erred in admitting and excluding evidence," points to nothing, and is too indefinite.

9. CHARACTER OF PRISONER: *Presumption from.*

If the jury find, from the evidence, that the prisoner is of good character, they may take that fact into consideration in determining his guilt or innocence; but if they believe, from the evidence, that he is guilty, they must so find, notwithstanding his good character.

10. —*Corpus delicti.*

For the rules of law as to proof of the *corpus delicti,* see opinion, page 743, *et seq.* (REPORTER.)

11. EVIDENCE: *Inconsistent statements of accused.*

False, improbable, inconsistent, or contradictory statements of an accused in attempting to explain suspicious circumstances or appearances, are prejudicial to him.

APPEAL from *Franklin* Circuit Court.

Hon. W. D. JACOWAY, Circuit Judge.

*Clark & Williams,* for appellant.

*Henderson, Attorney General, contra.*

ENGLISH, C. J. Thomas Edmonds was indicted in the circuit court of Johnson county for murder. On his application, the venue was changed to the circuit court of Franklin county, where he was tried; found guilty of murder in the first degree; motions in arrest of judgment and for a new trial were made and overruled, and he took a bill of exceptions. He was sentenced to suffer the death penalty on the twenty-seventh of February, 1880, and prayed an

appeal, which was allowed by one of the judges of this court.

I. In the Franklin circuit court, the prisoner moved to quash the indictment, because the circuit court of Johnson county discharged the list of grand jurors selected by the jury commissioners, and ordered the sheriff to summon others, etc.

It appears from the transcript, that on the fourteenth of April, 1879, being the first day of the term of the circuit court of Johnson county at which the indictment was found, the court, on motion of the state's attorney, quashed the list of grand jurors and alternates selected by the jury commissioners, because they had failed to certify said lists as the law required, and thereupon the sheriff was ordered to summon sixteen good and lawful men, citizens and qualified electors of Johnson county, to serve as grand jurors, etc. The sheriff, accordingly, returned into court the requisite number of men, who were found qualified, and impanneled and sworn as a grand jury.

That the court had the power to make the order complained of, was decided by this court in *Straughan et al. v. State, 16 Ark., 43;* and there is nothing before us to show that the power was improperly or erroneously exercised in this case.

II. The prisoner demurred to the indictment, and its sufficiency was also questioned by the motion in arrest of judgment.

The indictment contained two counts:

The first count charged, in substance, that "the said Thomas Edmonds, on the fourteenth day of August, 1878, in the county of Johnson, etc., willfully, deliberately, feloniously, and of his malice aforethought, and with premeditation, did kill and murder one Julia Edmonds, then and

Edmonds vs. The State.

there being, in some way and manner, and by some means, instruments and weapons to the jurors unknown," etc.

The second count charged that "the said Thomas Edmonds, on the fourteenth day of August, 1878, in the county of Johnson, etc., willfully, deliberately, feloniously, of his own malice aforethought, and with premeditation, did kill and murder a certain woman, whose Christian name was Julia, but whose surname is to the jurors unknown, then and there being, in some way and manner, and by some means, instruments and weapons to the jurors, unknown, contrary," etc.

The first, second and third causes assigned for the demurrer were, in substance, that the indictment did not aver the manner or means of the alleged murder.

The fourth cause was, that it did not state such facts as constituted any crime known to the law.

And the fifth and sixth causes were, that if the indictment charged any crime, it charged two separate and distinct offenses.

The court sustained the fifth and sixth causes of demurrer, and required the attorney for the state to elect on which count of the indictment he would proceed, and he elected to dismiss the first count, and proceed on the second, and thereupon the court overruled the demurrer.

The trial and verdict were upon the second count of the indictment.

The count was not bad on demurrer, or in arrest of judgment, because it stated that the surname of the woman alleged to have been murdered was to the grand jury unknown.

If known, it should have been alleged; if not, it might be so stated, as it was, and this was matter in issue to be proved by the state on the trial. *Cameron v. State, 13 Ark.,* 717.

And so it has been held that an averment, as in this case, that the defendant committed the crime at a place specified, "in some way and manner, and by some means, instruments and weapons to the jury unknown," is sufficient, when the circumstances of the case will not admit of greater certainty in stating the means of death. *3 Greenleaf Ev., note 4 to sec. 130; Commonwealth v. Webster, 5 Cush., 295; People v. Colt, 3 Hill (N. Y.), 432.*

No doubt the mode or instrument of death, if known to the grand jury, or if it can be ascertained by them, should be alleged in the indictment. *Thompson v. State, 26 Ark., 323; 29 ib., 168.*

But this rule must not be carried so far as to furnish a shield from punishment, where it is plain that a crime has been committed. *People v. Taylor, 3 Denio, 95.* It will be seen from the evidence in this case that if the means of death could not have been so alleged, the crime might have gone unpunished.

A person might be killed by violence on the bank of a river, and then thrown into the stream, and the body when afterward discovered might be so decayed and wasted as to leave no trace of the violence, and it might be impossible to tell whether the death was from drowning, or from the use of some weapon. Other examples may be easily imagined, though they may not frequently occur.

In *Howard v. State, ante, 433*, the question whether a count in an indictment, in which it was alleged that the means of death was unknown to the grand jurors, was valid, was waived, as not material in that case to be decided. Here the prisoner was convicted on a count making such allegation, and we hold it to be valid on demurrer, or motion in arrest of judgment.

III. The term of the Franklin circuit court, at which the

prisoner was tried, commenced on the third of November, 1879.

On the twenty-fifth of that month the prisoner filed a motion for a continuance of the case. The motion was based on the grounds: *First*, the absence, from sickness, of John W. Bush, Esq., who was represented to be the lead- ing counsel of the prisoner; *second*, the absence of H. F. Barna, a witness for prisoner, by whom he expected to prove that he stopped at Barna's hotel, in Argenta, and had with him the woman, Julia Edmonds, and her child, after the date of her alleged murder, and after she and her child were missing at Pratt's Landing, on the Arkansas river, in Johnson county, where it was supposed they were murdered; *third*, the absence of James Williams, of Wash- ington county, a witness for prisoner, by whom he expected to prove that, on the day after the supposed murder of Julia Edmonds, and after she and her child were missing from Pratt's Landing, prisoner conversed with said Wil- liams at Clarksville, and had with him said Julia and her child, and with them took passage on an eastern bound train of the Little Rock and Fort Smith Railway for Argenta.

The motion was taken up on the third of December, when it was found that the two witnesses named in the motion as absent, were then present, which left nothing in the motion but the absence of John W. Bush, Esq., and the court overruled the motion, and prisoner excepted.

Thereupon the prisoner filed an amended motion for continuance, on two grounds: *First*, the absence of *Frank Marion*, *Amanda Marion*, and *Mrs. M. S. Cook*, material witnesses for prisoner. That he had learned on the day before, that *J. N. Cook*, a witness for the state, would testify that prisoner stopped at his house on the night after the

supposed and alleged murder of Julia Edmonds, and was alone, and did not have her or her child with him, and represented to said Cook that he was from Pope county, and was then going to Sebastian county. That he could prove by said Frank Marion, Amanda Marion, and Mrs. M. S. Cook, that they were at the house of J. N. Cook on the night that he would state that prisoner stopped there, and that they would testify that the stranger, or man who stopped at the house of J. N. Cook, was not the prisoner, but another and different man; *second*, the absence of John W. Bush and John K. Hendricks, Esqs., represented to be the principal and leading counsel for the prisoner.

The attorney for the state admitted that said Frank Marion, Amanda Marion, and Mrs. M. S. Cook, would, if present at the trial, testify as stated in the amended motion for continuance, and thereupon the court overruled the motion; and prisoner excepted.

The two motions for continuance are embraced in the general bill of exceptions, and it was made the sixth ground of the motion for a new trial, that the prisoner was forced to go to trial without his leading and senior counsel.

It appears that the prisoner was zealously and ably defended at the trial by J. P. Byers, Esq., who prepared the above motions for him, and who filed the motion to quash the indictment, and also interposed the demurrer thereto; and who was also counsel for the prisoner, before the change of venue, on application for bail, made before his Honor, the circuit judge, at chambers, in Dardanelle. Whether Messrs. Bush and Hendricks knew more of the case, or could have made a better defense for the prisoner than Mr. Byers did, we have before us no means of determining.

Cases may occur in which the unavoidable absence of leading counsel in a cause, might be ground for a continu-

ance, but such motions are addressed to the sound discretion of the presiding judge, and unless it is made to appear that such discretion was abused to the prejudice of the party making the application, the overruling of the motion will not be cause for reversal here. No such abuse of discretion is shown in this case.

It appears that John W. Bush, Esq., resided in Livingston county, Kentucky, and attended to taking depositions for the prisoner there. Where John K. Hendricks lived does not appear. *Hunter v. Gaines et al., 19 Ark., 92; Golden v. State, ib., 590; Stewart v. State, 13 Ark., 734; Stillwell, Ex'r, v. Badgett, 22 Ark., 166; Ware et al. v. Kelly, ib., 442.*

IV. In connection with the amended motion for continuance, the ninth ground of the motion for a new trial may be disposed of, and which is stated in the motion as follows: "Because the court improperly permitted Francis Marion, Amanda Marion and M. S. Cook to be sworn in behalf of the state, and testify that they were the parties mentioned in defendant's motion for a continuance, and that they identified the defendant as being the man who stopped at the house of J. N. Cook a day or two after the murder, when the state, by her attorney had admitted, when said motion for continuance was submitted to the court, that said witnesses would swear that they had never seen defendant, and when said motion for continuance was overruled by the court by reason of said admission by the prosecuting attorney."

John N. Cook, witness for the state, after testifying about a skull and some woman's clothing that he and Thomas Martin had found below and near Pratt's Landing, in November, 1878, on a sand-bar, stated to the best of his knowledge, the prisoner stayed all night at his house,

about the sixteenth of August, 1878. Prisoner said that he had knocked a man down in Polk county, and was looking for the sheriff after him, and told witness not to be alarmed if during the night he jumped up and ran out of the house—said his name was Edmond Cook; seemed to be very restless. From his remarks, he came from the southwest to the house of witness, which would be nearly in the direction of Pittsburg Landing. Said he was a fortune-teller, and proposed to pay his board by telling the fortunes of the family, and did so. The man who stayed at the house of witness had light hair, blue eyes, and rather a dark complexion. Said he was on his way to Mazzard prairie. Clarksville is about due north of Pratt's Landing, about four miles distant. Witness lived at that time about two and a half miles northeast of Pratt's Landing, about four miles a little south of east of Clarksville.

FRANK MARION, witness for the state, testified that he did not know that he had ever seen the prisoner. He was at the house of John N. Cook in August, 1878, when a fortune-teller stayed all night there, but was blind with sore eyes and could not see him, and would not now recognize him.

Mrs. AMANDA MARION, witness for the state, testified that she and her husband stayed all night at the house of her brother (John N. Cook), in August, 1878, when another man also stayed there. Prisoner favored the man that stayed there on that night. He said his name was Edmond Cook, and that he had knocked a man in the head down about Georgetown, and was on the look-out. Said his horse had died, and that he had concluded he could make more telling fortunes than he could otherwise. She would not say positively that the prisoner was the man,

but she would say that he looked like him. She was certain that the fortune-teller did not have blue eyes. If she had seen the prisoner on the street she could not have identified him.

Mrs. M. S. Cook, witness for the state, testified that she was the wife of John N. Cook, and that a man stayed at their house, in August, 1878, and, pointing to the prisoner, said "that looks like the man." He had on a loose sack coat; said he had knocked a man in the head with a rock, and was looking for the sheriff. She could not swear that prisoner was the man, but thought so. He appeared to be very restless the night he stayed at the house, and stepped to the door several times, etc.

The bill of exceptions states that the prisoner objected to *Frank Marion, Amanda Marion* and *M. S. Cook* being sworn as witnesses for the state, and moved to exclude their testimony on the ground that they were the witnesses mentioned in his amended motion for continuance, and that the prosecuting attorney had admitted that, if present, they would testify as stated in said motion; but the court permitted them to be sworn, and to testify on behalf of the state, etc. They were cross-examined by the prisoner.

It also appears that after the state had closed, the prisoner was permitted to read in evidence the amended motion for continuance, etc.

By section 4644 Gantt's Digest, to avoid an application for continuance on account of an absent witness, the opposite party had to consent that on the trial the facts proposed to be proved by the absent witness should be taken as true.

But by act of March 5, 1879 (*Acts of 1879, p. 26*), this section was amended, so that if, upon the filing of the

affidavit for postponement, "the adverse party will admit that on the trial the absent witness, if present, would testify to the statement contained in the application for continuance, then the trial shall not be postponed for that cause; *provided,* the opposite party may controvert the statement so set forth in said motion of continuance by evidence."

It so turned out that the three witnesses, on account of whose absence the prisoner made the amended application for continuance, were present at the trial, and we can see no good reason why the state might not call and examine them, as she did.

The prisoner might have called them if he had thought proper, and he did cross-examine them. How better could the state have controverted the statement set forth in the motion than by calling the very witnesses themselves?

V. The seventh ground of the motion for a new trial is that the court erred in permitting David Hinkle to prove that prisoner had made threats against his . child, Ellen.

After the state had examined H. F. Barna, the first witness introduced, and who failed to prove that the prisoner was at his hotel in Argenta, in August, 1878, with the woman, Julia, and her child, and proved that their names were not registered there, though it was his custom to cause all guests to be registered, the state introduced DAVID HINKLE, whose testimony it may be well here to state in full, substantially, that the part objected to may be understood.

He testified in substance that he moved the prisoner from Washington county, starting on Sunday, about the tenth to the twelfth of August, 1878, to Pratt's Landing on the Arkansas river, in Johnson county. He had with

him a woman he called Julia, and claimed her as his wife. They also had with them a female child about four months old, which they claimed as their child. Witness, prisoner, the woman and child stayed all night at Fred Stout's, near the landing, on Tuesday night. Prisoner was on his way to Kentucky, and first employed witness to haul him to Ozark, but subsequently said he did not care a damn where witness left him, if it was in a cane-brake, just so it was on the bank of the Arkansas river. They left Stout's about daylight next morning, and wit-ness took him on to the river. When witness left them they were wending their way toward the river. He heard defendant say to the child, "Hush, or I'll be damned if I don't stamp your brains out, or throw you in the river," or something to that effect. [Which last statement defend-ant objected to, and moved the court to exclude it from the jury, and the motion was overruled.] Witness noticed nothing peculiar about the teeth of the woman, Julia. Defendant and the woman had a sachel, a basket, a camphor bottle and a tin cup. There was nothing pe-culiar about these articles. The woman had light hair, would weigh about 140 pounds, and lisped when talking. Defendant treated her kindly on the journey.

Here, some hair was shown witness, which was found near the skull above referred to, and witness thought it resembled her hair.

Witness was also shown a sachel, a bottle, clothing, lamp and cup, which were found at or near the landing, and he stated that he believed they were the same that defendant had with him on his journey from Washington county.

Witness was before the grand jury, at the April term, 1879, of the Johnson circuit court, and stated to the jury

that the woman went by the name of Julia Edmonds, because she was with the defendant, and he claimed her for his wife; but he further told them that he was informed that she was not his wife, and he did not know what her name was, and could not inform them. He told them that he had learned that defendant had a wife and family living in Livingston county, Kentucky, whom he had left when he moved away from there with the woman Julia, the deceased. He got his information from the county clerk of Livingston county, but did not tell the grand jury how he got his information. The clerk did not inform him what deceased's surname was, etc.

It may be here remarked that the woman, Julia, and her child were never seen by any witness produced at the trial after Hinkle left them, with the prisoner, near the river.

We think that the harsh, passionate and inhuman expressions of the prisoner to the child, in the presence of the mother, near the place and shortly before they disappeared, were calculated to throw some light upon the condition of his mind, and his feelings toward the mother as well as the child, at the time, and that they were properly admitted to the jury for what they were worth, under the rule laid down in *Austin v. State 14 Ark., 555*. See also *Doghead Glory v. State, 13 Ark., 239; Dunn v. State, 2 ib., 229; Liles v. State, 30 Ala., 24*.

VI. The eighth ground of the motion for a new trial is, that the court erred in excluding a part of the evidence of John M. Armstrong.

It appears from the bill of exceptions, that John M. Armstrong, witness for the state, testified, in substance, that he was foreman of the grand jury which found the indictment in this case; that the surname of the woman, defendant was

charged with having murdered, was to the grand jury un-
known; his recollection was, that Hinkle and others were
asked the question as to the name of the deceased, and
stated that it was Julia, and the defendant claimed her as
his wife, and that she was commonly called Julia Ed-
monds; that the grand jury could only ascertain that the
deceased, Julia, was traveling with defendant, but were
informed that she was not his lawful wife, and, after due
inquiry, they were unable to ascertain her surname; nor
could the grand jury ascertain from the witnesses the man-
ner and means by which she came to her death; they used
all means in their power to learn all the facts in regard to
the murder, and were wholly unable to ascertain in what
way or manner, or by what means, instruments or weapons,
the deceased came to her death.

On cross-examination, the prisoner offered to prove by
this witness that the grand jury embodied two counts in
the indictment, and in the first count described the woman
that defendant was charged with having murdered, as Ju-
lia Edmonds, but the court excluded such evidence.

It was proven on the trial, by other witnesses, that the
real name of the woman was Julia *Alsbrook*, who grew up
to young womanhood in the neighborhood of prisoner, in
Livingston county, Ky., and that, about April, 1877, he
abandoned his wife and family there, and eloped with Ju-
lia Alsbrook, and brought her to Washington county, in
this state, where he cohabited with her as if his wife. It
was sufficiently proven that the grand jury did not know
her true surname, but they were informed that she was
called Julia Edmonds; hence, she was so described in the
first count of the indictment; and it was alleged in the
second count, that her surname was to the jurors un-
known.

It was not necessary for the foreman of the grand jury, or any other witness, to prove what the first count in the indictment alleged, it being before the court, and subject to inspection.

This disposes of the tenth ground of the motion for a new trial, which is similar to the eighth.

VII. The eleventh ground of the motion for a new trial is, that the court erred in refusing to permit defendant to read, in evidence to the jury, the first count of the indictment, as tending to show that the grand jury knew the surname of the woman charged to have been murdered by him.

The bill of exceptions shows that defendant offered to read in evidence the first count of the indictment, and the court excluded it.

The prisoner demurred to the indictment, on the ground that each count charged a separate and distinct offense, whereupon the court compelled the attorney for the state to elect between the counts, and he elected to abandon the first, and prosecute upon the second. At the time the demurrer was interposed, the prisoner had on file the depositions of a number of witnesses taken by him in Livingston county, Ky., who proved that the surname of the woman he was charged with murdering was *Alsbrook*. If the prosecuting attorney had elected to prosecute upon the first count, which alleged her surname to be Edmonds, the ingenious counsel for prisoner would perhaps have insisted upon his acquittal for variance between the allegation as to her surname and the evidence. Her surname was not Edmonds, for she was not the wife of the prisoner. *Regina v. Campbell, 1 Carrington & Kerwin, 82.*

Both counts in the indictment were mere pleadings, and neither of them could be used as evidence on the trial. *Starkie on Evidence, by Sharshwood, top p. 407, marginal p. 450.*

In *Regina v. Campbell, sup.*, the first count of the indictment charged the prisoner with having killed Catherine Maginniss; in the second count, the deceased was described as Catherine Campbell, and in the third count, "as a woman whose name to the jurors is unknown." There are other similar precedents, but in no case have we found any intimation that one count could be used as evidence to disprove an allegation of another as to the name of the person killed or injured.

It was perhaps in consequence of the difficulty in some cases of ascertaining, alleging and proving the names of persons injured, that the Code makers were induced to adopt the provision that: "Where an offense involves the commission or attempt to commit an injury to person or property, and is described in other respects with sufficient certainty to identify the act, an erroneous allegation as to the person injured, or attempted to be injured, is not material." *Gantt's Dig., sec. 1786.*

VIII. The twelfth ground of the motion for a new trial is, that the court erred in permitting the state to prove by one Vest, and others, that they heard the woman, defendant was charged with murdering, say, in her lifetime, that she had a peculiar tooth or tusk in the roof of her mouth.

J. D. VEST testified: That defendant worked for him in Washington county in 1878; that he had a woman with him, named Julia, who had a child while at his house, who was about four months old when he left; witness informed him that he had heard that he was not married to Julia, and he said that it was all a lie, but that they might give him considerable trouble about it; seemed to be excited about it; said next morning he was going back to Kentucky; Julia was heavy-set, light hair, blue eyes, and lisped at times; it was generally understood that she had a tooth

behind her front teeth, and this was the cause of her lisp-ing; witness had heard her speak of it. [Objected to by defendant, and objection overruled by the court.]

MARY C. VEST testified: That she knew defendant, and a woman he had with him, named Julia, in 1878; that Ju-lia had a tooth in her mouth a little back of her front teeth, in the upper jaw; witness saw the tooth but once; she was certain it was back of the front teeth, not quite touching them; the cavity in the skull shown witness looked like it might be the same; Julia said to witness that she had wanted the tooth taken out; witness thought the skull was hers from the places where the teeth used to be.

S. PERDUE testified: That he had known defendant since about April, 1877; he lived with witness about five months, and left his house in October, 1877; he had a woman he called Julia; she had a tooth on the right side of her mouth, behind the upper front teeth, and said it hurt her tongue, and made her lisp; she asked Edmonds to have the tooth taken out, and he said his money had given out; witness had seen her sit for an hour at a time and feel of her tooth, and complain; it did not touch her front teeth at all; there was a gum between it and her front teeth; could not say that the tooth in the skull shown him was further back than the one in her mouth; when witness learned that she was not defendant's wife, he did not like to have them about him; she was pregnant.

A number of other witnesses testified substantially the same as the above about the peculiar tooth in the roof of the woman's mouth, back of her upper front teeth, which seems to have been regarded as important in identifying the skull produced at the trial as being her skull.

It being material to prove that the woman, Julia, had such a peculiar tooth in the roof of her mouth as that de-

scribed by the witness, her declarations about it, made when there could have been no *lis mota*, were admissible as *res gestæ*. *Cornelius v. State*, *12 Ark.*, *805*; *Yarbrough v. Arnold*, *20 ib.*, *592*.

IX. The thirteenth ground of the motion for a new trial is, that the court erred in refusing to permit defendant's counsel to read, as part of his argument in the case, from a law-book, an instance of the conviction of an innocent man on circumstantial evidence.

From what law-book, or what part of it, the counsel proposed to read, does not appear.

The matter was under the control, and within the discretion, of the presiding judge, and we have nothing before us to show that he abused such discretion. *Winkler v. State*, *32 Ark.*, *550*.

X. The fourteenth ground of the motion for a new trial, that the court erred in overruling the motion in arrest of judgment, must have been a slip of the pen of the counsel for the prisoner.

The fifteenth and sixteenth grounds are general assignments, that the court erred in admitting and in excluding evidence, pointing to nothing, and are too indefinite.

XI. The first and second grounds of the motion for a new trial question the sufficiency of the evidence to warrant the verdict.

We shall have more to say about the evidence in considering the instructions. It is enough to say here, that upon the whole, there appears no such want of evidence to sustain any material allegation of the indictment as to induce us to award a new trial on the facts. It belongs to that class of cases in which it is the peculiar province of the jury to make their verdict final upon the weight of the evidence,

and the fate of the prisoner must rest on their award. He must abide the judgment of his peers on the facts.

XII. The giving and the refusing of instructions were made the third, fourth and fifth grounds of the motion for a new trial.

It appears from the bill of exceptions that twenty-one instructions were moved for the state; nineteen for the prisoner, and the court gave six of its own motion, making in all forty-six.

Why it was thought necessary to offer so many instructions to get the law of the case fairly submitted to the jury, we are at a loss to conjecture. We shall not swell this opinion, and encumber the reports, by copying and commenting upon all of the instructions objected to by the prisoner, and given by the court, or offered by him, and refused by the court. We have examined all of the instructions with care, to see if the prisoner might probably have been prejudiced by the giving of any objected to by him, or the refusal of any moved in his behalf.

Such of the instructions as we deem it proper to notice, will be treated in connection with the subjects to which they relate.

XIII. As to the allegation in the second count of the indictment, that the surname of the woman, Julia, was to the grand jurors unknown—

The court distinctly and correctly charged the jury, in the eighteenth, nineteenth and twentieth instructions moved for the state, and objected to by prisoner, that this was a material allegation, and must be proved; and, also, that the grand jury made due inquiry to ascertain her surname, etc.

The prisoner, in the fifth and sixth instructions moved by him, and refused, asked the court to charge the jury, in

effect, that if they believed, from the evidence, that the grand jurors knew, or might have ascertained by a reasonable effort, the surname by which the woman, Julia, was commonly called or known, they must acquit the prisoner, though they might believe, from the evidence, that he killed and murdered the said Julia.

A number of the grand jurors testified that they did not know, and could not ascertain, what the surname of the woman Julia was; that some of the witnesses testified that she was called Julia *Edmonds*, because she lived with the prisoner, though they had been informed that he was not her husband; that he had a wife in Kentucky, and that they did not know what her surname was.

If it might have been alleged in the second count of the indictment, as it was in the first, that her surname was Edmonds, because she lived in adultery with the prisoner, it was not necessary so to allege, when the grand jurors were informed that such was not her true or lawful surname, and did not, in fact, know, and could not ascertain from the witnesses, what it was; though after the indictment was found, it was ascertained to be *Alsbrook,* and so proven by the prisoner's Kentucky witnesses.

XIV. AS TO THE MEANS OF DEATH:

In the twenty-first instruction given for the state, the court charged the jury that it must appear from the evidence that the grand jury did not know in what way or manner, or by what means, or instruments or weapons, the deceased was killed, and that they made due inquiry to ascertain these facts.

Other instructions left it to the jury to determine from the evidence whether the woman was in fact dead, and whether she was murdered by the prisoner.

The foreman and others of the grand jury testified that

they did not know, and could not ascertain, the means of her death.

The jury found, in effect, by their verdict, that she was dead, and that the prisoner murdered her, but if they, or the grand jury, knew the means of her death, they were wiser than we are after carefully reading all of the evidence.

XV. As to character of accused:

The court charged the jury, in instruction No. 26, given of its own motion, against the objection of the prisoner, that:

"If the jury find, from the evidence, that the defendant is a man of good character, they may take this fact into consideration in determining the question of his guilt or innocence; but if they believe, from all the evidence in the case, that the defendant is guilty, they must so find, notwithstanding his good character."

This instruction was given instead of the fifteenth asked for prisoner, in these words: "The court instructs the jury that if the prisoner be proved of good character as a man of peace, the law says that such good character may be sufficient to create or generate a reasonable doubt of his guilt, although no such doubt would have existed but for such good character."

The Kentucky witnesses, whose depositions were taken by the prisoner, were his neighbors, some of them his relations, and they had all been acquainted with him for many years. His counsel propounded to each of them two interrogatories relating to his character.

It will be sufficient to copy the two interrogatories, and the answers given to them by E. F. Leman, a minister of the gospel, the answers of the other witnesses being, in substance, the same, and none more favorable:

Int. (3). "Tell whether or not you are acquainted with

the general reputation of said Thomas Edmonds among his neighbors and acquaintances for truth, honesty and morals. If so, is said reputation good or bad?"

Ans. "I am, and his general reputation among his neighbors and acquaintances for truth, honesty and morals is good."

Int. (22). "Was said Edmonds a moral or an immoral man? Was he or not a member of any Christian denomination or church? If so, to what church did he belong?"

Ans. "I regarded him as a very moral man, and he came as near living above suspicion as any man. He was a member of the United Baptist church, and I think a deacon; prayed in public, and was regarded as a devout Christian."

The witnesses manifestly do not mean to say that he maintained this good moral and Christian character in that community later than down to the fifteenth of April, 1877, for they state, in answer to other questions, that he and *Julia Alsbrook* left about that time, and that he did not return to the neighborhood until the twenty-second of August, 1878, which was shortly after the time of the alleged murder. They also proved that he had been twice married. His first wife died after he had lived with her three or four years. He had been living with his second wife six or seven years, and had two living children, one by the first, and the other by the second wife, when he left. Julia Alsbrook, a playful, romping girl, who could read, but could not write, raised in the same neighborhood, and about seventeen years of age, had been living in his family about six months, when they left.

Other witnesses show that he brought her to this state, and cohabited with her down to the time that he brought her to Pratt's Landing, on the fourteenth of August, 1878, when she disappeared.

It was plain to the jury, from the evidence, that however good the general moral character may have appeared to be, down to the period above indicated, he had outraged public morals by abandoning his wife and children, and church, and eloping and living in adultery with this unfortunate young woman.

It is the better practice, in proving the character of an accused, with the view to raising a presumption of innocence from it, to direct the inquiry to some particular trait of character involved in the commission of the alleged offense. For example: If the charge of perjury, what is the character of the accused for truth; if larceny, for honesty; if rape, for chastity; if some deed of violence the opposite character. *Burrill on Cir. Ev., 525 to 530; Kee v. State, 28 Ark., 164.*

Here the inquiry extended to the general good character of the prisoner for morals, religion, etc., and it was proved to be very good down to within about sixteen months of the time of the alleged murder, when there was an unfortunate break in it. Some of the Arkansas witnesses testified that he was quiet and peaceful while living in Washington county. The court correctly charged the jury in the instruction copied above (No. 26), that if they found from the evidence that defendant was of good character, they might take this fact into consideration in determining the question of his guilt or innocence; but if they believed, from the evidence, that he was guilty, they must so find, notwithstanding his good character. *Kee v. State, 28 Ark., 164; Burrill on Cir. Ev., 530, 531.*

The instruction No. 15, copied above, asked for prisoner, and refused, to the effect, that the law says that good character may be sufficient to create a reasonable doubt of guilt, though no such doubt would exist but for such good

character, was properly refused, on the facts of this case. Instruction No. 26 was appropriate, and sufficient on the subject of character.

The rule, as practically laid down by the courts, says Mr. BURRILL, is, that character evidence is of no force or value except in doubtful cases. If the case hangs in even balance, character should make it preponderate in favor of the accused; but if the evidence of guilt be complete and convincing, testimony of previous character can not, and ought not to avail. This rule, however, is not to be construed to exclude the admission and due consideration of evidence of character, even in clear cases. *Ib., 531.*

The rule may be as strong as stated by the counsel for the prisoner, in the above proposition, in a case of larceny, where possession of the stolen goods, by the accused, is the only evidence of guilt, and he has no witness by whom he can prove how he obtained such possession—there, good character may well create a doubt of his guilt. *Ib., 531, note (b).*

XVI. CORPUS DELICTI, ETC.

The prisoner moved the following instruction, which the court refused :

"1. The jury are instructed that the state has wholly failed to make out or prove the *corpus delicti* of the charge in the indictment, and the jury are, therefore, instructed to acquit the defendant."

It would have to be a case very barren of proof to warrant the court in depriving the jury of their constitutional province to judge of the facts, and in instructing them that the state had wholly failed to prove any material matter, and that they must find a verdict of acquittal. See *sec. 23, Art. VII, Constitution.*

After quoting some appropriate passages from *Mr. Bur-*

*rill's work on Circumstantial Evidence*, relating to proof of . the *corpus delicti*, supported by other authorities, we will briefly state some of the leading facts and circumstances in evidence, conducing to prove the body of the crime in this case, and the connection of the prisoner with it.

"In cases of alleged homicide, the proof of a *corpus delicti*, involves that of the following points, or general facts: *First*, the fact of death, particularly as shown by the discovery of the body, or its remains; *secondly*, the identification of such body, or remains, as those of the person charged to have been killed; and, *thirdly*, the criminal agency of another, as the cause of the death.

"1. The fact of the death. This is the basis of the *corpus delicti;* and the circumstance which furnishes the best proof of it, as well as the most effectual means of ascertaining its cause, is the finding and inspection of the dead body itself. (*Wills on Cir. Ev., 162*). Hence it is a general rule of evidence that a dead body must have been discovered and seen, so that its existence and identity can be testified to by eye-witnesses. It is considered unwarrantable and dangerous to *infer* the fact of the death of a person from the circumstance of his sudden and unaccountable disappearance, even when followed by long continued absence, and even although such circumstances may be connected with others, apparently casting suspicion upon a particular individual. Some early cases of mistaken convictions, founded on such inferences, sufficiently establish the sound policy of this rule (*Best on Pres., sec. 202, p. 272*), which, so far as its authority is concerned, rests upon the declaration of Sir MATHEW HALE, that he would never convict any person of murder or manslaughter, 'unless the fact was proved to be done, or at least the body found.' *2 Hale's P. C., 290*.

"But to require the discovery of the body, in all cases, would not only be unreasonable and absurd in itself, but would seriously interfere with the course of criminal justice. MR. BENTHAM, regarding the rule in this unqualified light, pronounced it to be in the highest degree prejudicial to justice. 'To secure to himself impunity,' he observes, ' a murderer would have no more to do but to consume or decompose the body by fire, by lime, or by any other of the well-known chemical menstrua, or sink it in an unfathomable part of the sea. In any of these cases, might the body be effectually got rid of.' (*Bentham, 3 Jud. Ev., 234*). And in the case of *The United States v. Gilbert et al.*, (*2 Sumner, 19, 27*), Mr. Justice STORY, in summing up the case at the trial, said of the same rule, or proposition, that 'it certainly can not be admitted as correct in point of common reason or of law, unless courts of justice are to establish a positive rule to screen persons from punishment, who may be guilty of the most flagitious crimes. In the cases of murders committed on the high seas, the body is rarely, if ever, found; and a more complete encouragement and protection for the worst offenses of this sort could not be invented than a rule of this strictness. It would amount to universal condonation of all murders committed on the high seas.'

"It follows, therefore, that, in cases where the discovery of the body, after the crime, is impossible, the fact of death may be proved by other means. Indeed, the rule, as stated by Lord HALE himself, is in the alternative—the fact must be proved to have been done, *or* the body found. The question then occurs, by which kind of evidence—direct or indirect—must the fact of death be established. The language of Lord HALE indicates the former. But, accordin to the rule, as it seems to be understood by the best mod-

ern writers, the fact of death, when the body can not be found, may be proved by circumstances. 'It may be *in-ferred*,' says Mr. Wills, 'from such strong and unequivocal circumstances of presumption as render it morally certain, and leave no ground for reasonable doubt.' (*Wills on Cir. Ev.*, *162; Best on Pres.*, *sec. 202, p. 271.*) In illustration of this, the same author (Mr. Wills) cites the case of *Rex v. Hindmarsh* (*2 Leach C. C., 569*), where the prisoner, a sea-man, was seen, one night, to take the captain in his arms, and throw him into the sea; after which he was never seen or heard of, but near the place on the deck where the cap-tain was seen, was found a billet of wood, and the deck and part of the prisoner's dress were stained with blood. It was objected that the *corpus delicti* was not proved, as the captain might have been taken up by some of the neighboring vessels. But the court, while admitting the general rule on the subject, left it to the jury to say whether the deceased was not killed before his body was cast into the sea. The jury having found in the affirma-tive, the prisoner was convicted of murder, which convic-tion was, on a case reserved, held good by all the judges. (*Best on Pres., sec. 203.*)

"2. *Identification of the body, or its remains.*

Supposing a dead body, or its remains, to have been dis-covered, the next step in the proof of the *corpus delicti* is the identification of such body, or remains, as those of the person charged to have been slain. Where the body is found shortly after the commission of the crime, and the face has not been disfigured by violence, accident, or natu-ral decay, it may be identified by direct and positive testi-mony of persons to whom the deceased was known. But where the features have been destroyed, the body may be identified by circumstances—as by the dress, articles found

on the person, and by natural marks upon the person. In Colt's case (*New York Oyer and Terminer, January, 1842*), where a considerable portion of the face had been beaten in by blows, and the progress of decay had otherwise rendered direct recognition impossible, the body was identified in this way. In *McCanrie's case* (*13 Smedes & Marshall, 472, 478,*) where the face of the deceased had been eaten away by hogs, identification was effected in a similar manner. In the case of *Rex v. Clewes* (*4 Carv & P., 221*), the body of a man was, after a lapse of twenty-three years, identified by his widow from some peculiarity about his teeth, and by a carpenter's rule and pair of shoes found with the remains, and identified, etc. In *Webster's case* (*sup.*), the body was dismembered, and an attempt made to destroy it. The head of the deceased had been placed in a furnace, and exposed to strong heat. But some blocks of mineral teeth resisted the action of the fire, and were identified by a dentist as part of a set of teeth which he made for the deceased, and which he wore at the time he disappeared. Some other portions of the body, not subjected to the fire, were found and identified by peculiar appearances. A case is mentioned by *Mr. Wills*, in which the remains of a female, consisting merely of the trunk of the body, from which the other parts had been cut, were identified by a curious train of circumstantial evidence, embracing several facts of conduct on the part of the prisoner. (*Wills on Cir. Ev., 165*)

"3. *Criminal agency as the cause of death.*" A dead body, or its remains, having been discovered and identified as that of the person charged to have been slain and the basis of a *corpus delicti* being thus fully established, the next step in the process, and the one which serves to complete the proof of that indispensable preliminary fact is,

to show that the death has been occasioned by the crim-
inal act or agency of *another person*.   This may always be
done by circumstantial evidence, including that of the
presumptive kind; and for this purpose a much wider
range of inquiry is allowed than in regard to the funda-
mental fact of death, and all the circumstances of the case,
including facts of conduct on the part of the accused, may
be taken into consideration." *Burrill on Circumstantial
Evidence, p. 678, 683; Liles v. State, 30 Ala., 24.*

Having thus shown what appear to be the well-estab-
lished rules of law as to proof of the *corpus delicti*, we will
now proceed to state the leading facts and circumstances
which were in evidence in this case.

We have seen from the testimony of J. D. VEST,
above copied, that when the prisoner was informed that it
was known that he was not married to the woman, Julia,
he seemed to be excited—said it was all a lie, but expressed
apprehension that it might give him trouble, and said he
would go back to Kentucky.

He first employed DAVID HINKLE to haul him, the wo-
man, Julia, and the young child to Ozark, which is on the
Arkansas river, and near the line of the Little Rock and
Fort Smith railroad, but afterwards procured Hinkle to
bring him lower down to Pratt's Landing; saying he did
not care a damn where he was left, if it was in a cane-
brake, just so it was on the bank of the Arkansas river.

They staid at the house of FRED STOUT (as proved by
Hinkle, Stout and others), on the Seth Howell farm about
a mile southeast of Pratt's Landing, on Tuesday night of
the thirteenth of August, 1878.   Prisoner told Stout that
he was on his way to Kentucky; had rather go by water
than by rail, and was not in a hurry anyhow; asked Stout
when a boat would come down, and he told him there

would be one down the next day; but none came down for several months.

Prisoner, with the woman and child, left Stout's house next morning (fourteenth August) about daylight, and Hinkle took them on near to the river and left them there. We have above seen that prisoner was in a passion when Hinkle left him. Why he left the house of Stout so early in the morning when no boat was in sight or hearing does not appear. He seems to have been in the neighborhood of Pratt's Landing for several days, though no witness saw the woman or child after Hinkle left them.

PETER HOWELL, who lived within about half a mile of Pratt's Landing, recognized the prisoner at the bar, and testified that he came to his house on Thursday, the fifteenth of August, 1878, to get something to eat for his wife and child, and when he started off he said that "women were a damned heap of trouble anyhow."

DORCAS HOWELL testified that he saw the prisoner once, but could not identify him at the trial. That he came to his house on Friday, in August, 1878, to get something to eat, and said women were a damned heap of trouble; and witness thought he was mad, though he said nothing else that led him to believe he was mad.

MARY HOWELL saw him when he had some cooking done (perhaps at Dorcas Howell's), and afterwards. It was a'ter he was at Dorcas Howell's that she found the two bonnets, which will be noticed below.

If JOHN N. COOK, whose testimony we have above stated, was not mistaken (and he was rather corroborated than contradicted by other witnesses), prisoner was at his house on the night of the sixteenth of August, in the character of a fortune-teller.

THE TWO BONNETS. Mary Howell further testified that

after the prisoner was at Dorcas Howell's house, she found two bonnets, one a woman's and one a child's, and a lamp, at Pratt's Landing. The child's bonnet was solid gingham, the other was striped, red and purple checked. She had the bonnets at her house a long time, but did not know what became of them. This, she thought, was about September, 1878.

FELIX BONE testified that he was present when the two bonnets, lamp, a bottle and tin cup were found. They were found within four feet of the bank of the river, and at this point the water was near the bank, *and very deep*. He made particular search for the bonnets afterwards, and could not find them. The lamp, bottle and cup were produced in court, and there was some evidence conducing to prove that prisoner and the woman, Julia, brought them with them on their journey from Washington county to Pratt's Landing.

FRED STOUT also testified that he saw the two bonnets on the bank of the river where they were found, and they appeared to be the bonnets worn by the woman, Julia, and her child when they staid with him all night. He had noticed the child's bonnet particularly when it was on a table at his house.

If the bonnets of the mother and the child, and the lamp, found on the brink of the deep water, could have spoken, they might, perhaps, have disclosed a tale of horror.

THE SACHEL AND CLOTHING, ETC. We have above shown what Hinkle stated about the sachel.

E. CARTER testified that one evening in the latter part of August, 1878, he found an oil-cloth sachel in the field where he was at work, about a mile from Pratt's Landing. He found it in the corner of the fence, at the lane between

the Pratt and Collier farms. He took the sachel home, and Mrs. Collier, who had a key that fit it, opened it.

It may be here briefly stated that this sachel and contents were produced in court at the trial. Fred Stout identified the sachel as the one that the woman, Julia, had at his house. It contained a dress, shawl, braid, some brass jewelry, and other articles proved to have belonged to her, also some clothing of her child. The braid was of light color, and about the color of her hair.

THE SKULL, FRAGMENTS OF CLOTHING AND HAIR FOUND NEAR IT.

About the twenty-second of November, 1878, THE. MARTIN, who lived about a mile and a quarter from Pratt's Landing, found a skull of a human being about a quarter of a mile below the landing, also some ribs, and the bones of a hand or foot, a calico and cotton skirt, and some light-colored hair about eight or ten inches long. The skull was eight or ten steps from the edge of the water, the river being very low. The hair was hanging in a root. There was a tusk back of the upper front teeth. He left the skull there. The skull and hair were produced at the trial, and he believed them to be the same found by him. The hair was on a stump root. The clothes were very rotten. The calico had colored leaf or vine as figures. He thought the flowers were brown, but did not remember the color of the ground.

JOHN N. COOK testified that he and The. Martin found the skull and some woman's clothing near Pratt's Landing. He afterwards saw the same skull at Craft's, the same produced in court. The calico was a purple ground, and a flower or vine; could not tell the color of the vine or flower.

FRED. STOUT testified: That, having heard that The.

Martin had found a skull, he went to the river and found the skull, and a piece of calico that resembled the dress the woman Julia had on at the time she stayed with him; he recognized it from the figures on the calico; he went to the place three times, and, to the best of his knowledge, it was part of the dress which she had on; the hair produced and shown witness resembled hers; the dress was of a dark color, and the figures of a dark brown; he also saw, at the place where the skull was found, on a sand-bar, a white cotton skirt, the upper part with a draw-string; did not see this skirt the night the woman Julia stayed at his house; did not save any of the fragments of the dress.

W. R. CRAFT testified: That the skull produced in court was brought to his house by Mr. Price and Mr. Cochran, and afterwards taken away by Fred. Stout; he knew the skull to be the same that was at his house, by the tusk back of the upper front teeth; three or four days after the skull was brought to his house, he went to the place where it was found, and found there a rib about the shape and size of the rib of a human being; also saw some female clothing, which was part of a white skirt with a draw-string, and part of a calico dress, dark ground, with flower-like vine with leaves.

Whether the tusk which a number of the Arkansas witnesses testified the woman Julia had in the roof of her mouth, back of the upper front teeth, while living, was in the skull when it was found, does not distinctly appear, but it seems, when the skull was produced at the trial, the tusk was not in it, but there was a socket or cavity where the most of the witnesses represented the tusk to have been; the Kentucky witnesses had seen no such tusk in her mouth.

There was some evidence that she had, when living, a

small tooth in front of the upper teeth, which was indicated in the skull.

Two medical witnesses who examined the skull were of the opinion that it had been shocked by a blow, which caused the blood to coagulate in the outward tissues, seen under the microscope ; one of them had seen heads before with teeth in the roofs of the mouth.

Other witnesses thought that the discoloration upon the skull was from exposure.

There was conflicting evidence about the teeth, etc.

We shall, further on, give the statements of the prisoner about what became of the woman Julia and her child.

We need only to say here, that there was some proof of the *corpus delicti*, and its weight and sufficiency were properly left to the jury, and that the court did not err in refusing the *first* instruction moved for the prisoner, and copied above.

The seventh, eighth, tenth and nineteenth instructions moved for appellant also relate to proof of the *corpus delicti*, and are noted in the margin refused, with reference to other instructions given, which the court seems to have regarded as sufficient on that subject.

The court, in the series of instructions given, after defining murder generally, express and implied malice, and how manifested, and the statute degrees of murder, distinctly charged the jury that they could not find the defendant guilty of murder in the first degree, unless they were satisfied, from all the evidence, beyond a reasonable doubt, which was properly defined, that he willfully, deliberately, maliciously, feloniously, and with premeditation, *killed* the woman Julia, etc.; and that to find him guilty of murder in the second degree, they must believe, from the evidence, that he willfully, feloniously, and with malice

48

aforethought (but without deliberation and premeditation), did *kill* the woman Julia, etc. And in the twenty-third instruction, given by the court of its own motion, the jury were charged: That if they believed, from the evidence, that the defendant was the last person ever seen with the deceased, and that she had never been seen since that time, and that the defendant had failed to account for or explain her absence, these were circumstances which tended to establish defendant's guilt; *but were not alone sufficient to warrant a conviction;* that it must also appear from the evidence that the *woman Julia was actually dead, and that she came to her death by the agency of the defendant.*

XVII. The first part of the instruction last above copied (No. 23) must, of course, be taken and interpreted in connection with the evidence showing the relation between the prisoner and the woman Julia. Had he been merely casually in company with her at Pratt's Landing, where she disappeared, he would have been under no obligation to account for her. But such was not the case. He could not plausibly interpose the plea of Cain—*he was her keeper.* He had induced her to abandon home, friends, and a life of virtue in Kentucky, and lead with him a life of shame. in Arkansas. He took her to Pratt's Landing. She and her young child were in his charge, and dependent upon him. Her dress and the contents of her sachel show that she had but little worldly goods. It was but reasonable, under the circumstances, that he should be required to account for her. How he accounted for her we shall see further on.

XVIII. CIRCUMSTANTIAL EVIDENCE:

The court, after properly defining "a reasonable doubt," in instruction No. 12, given for the state (See *Benton v. State, 30 Ark., 334*), charged the jury (instruction No. 13) that: "In cases of circumstantial evidence, the law does

not demand absolute, mathematical certainty, but if all the circumstances established by the proof, taken together, convince the minds of the jurors, beyond a reasonable doubt, of the defendant's guilt, they will be justified in finding a verdict against him.

And in instruction No. 14, given for the state, that: "In determining the question of the guilt or innocence of the defendant, you will take into consideration all the facts and circumstances connected with the case, as shown by the evidence, giving to them all their due and natural weight, considered in the light of your observations of human actions and motives in human affairs."

These instructions are substantially such as were approved in *Benton v. State, sup.*

For the prisoner, the following instruction (No. 3) was moved, which the court refused: "The jury are instructed that circumstantial evidence should be acted upon with great caution, especially where the public anxiety for the detection of a great crime creates an unusual tendency to exaggerate facts, and draw rash inferences."

Hypothetical instructions should be based on facts in evidence, and not on imaginary, assumed, or conjectured facts. There is nothing in the transcript to show that there was any public excitement in Franklin county pressing for the conviction of the prisoner. He was not being tried by the masses, but before a court and jury, supposed to be removed from excitement, and under the most solemn obligations to afford him a fair and impartial trial, according to law and evidence. The rules and value of evidence, either direct or circumstantial, are fixed, and can not be made to bend and swerve with the outward passions of the multitude.

If his Honor, the presiding judge, had any reason to be-

---

Edmonds vs. The State.

---

lieve that the jury were under any pressure from without, it would have been his duty, as, doubtless, his pleasure, to caution them against it. The instruction, as framed, was properly refused.

In the fourth instruction moved for the prisoner, and refused, the court was asked to charge the jury, in substance and effect, that, to warrant the conviction of the prisoner on circumstantial evidence, it must be as strong and convincing as direct evidence.

Authors have speculated and differed about the relative value of direct and circumstantial evidence.

There is no difficulty in conceding, at the outset, says Mr. BURRILL (*Cir. Ev., p. 224*), that as a medium of judicial proof, direct evidence unquestionably ranks as the superior of the two species. And Mr. GREENLEAF classes direct evidence as primary, and circumstantial as secondary.

There may be cases resting on circumstantial evidence, where a large number of well-linked facts, pointing unquestionably to the guilt of the accused, are as convincing as the testimony of one or more eye-witnesses. But such cases have rarely occurred, in our experience.

If an unimpeached witness had sworn in this case that he saw the prisoner knock the woman, Julia, on the head, and throw her into the river, and pitch her child in after her, we should have felt more positively assured of his guilt than we do upon all the circumstances in evidence in this case. Yet, it is well settled that men may be convicted of crime on circumstantial evidence. Otherwise, the most atrocious murders, committed in darkness, or in secret places, witnessed by no human eye, might go unpunished.

XIX. STATEMENTS OF ACCUSED.

By instruction No. 17, given for the state, against the

objection of the prisoner, the court charged the jury that:

" If the jury find from the evidence that the defendant made any false statements as to the absence of the woman whom he is charged to have murdered, or what became of her, or any conflicting or unreasonable statements as to his whereabouts, about the time said woman was first missing, they may be considered by the jury as circumstances tending to establish his guilt."

And of its own motion, and against the objection of the prisoner, the court charged the jury (No. 25): "That when the statements of the defendant are introduced in evidence, all he said in the same conversation is evidence before the jury, as well what he said in his own favor as against him; but in determining the weight to be given to such statements, the jury should compare their consistency with all the other testimony in the case, and so form their opinion of the weight to be attached to them."

Instruction No 12, moved for the prisoner, and refused by the court, also related to statements made by him, and was, in substance and effect, the same as instruction No. 25, given by the court of its own motion.

Instructions Nos. 13 and 14, moved for the prisoner, relate to the weight to be attached to confessions made by a party accused of crime, which appear to have been refused by the court as abstract.

There is no evidence that the prisoner made any confession or admission of guilt.

False. improbable, inconsistent, or contradictory statements of an accused, in attempting to explain suspicious circumstances, or appearances, are prejudicial to him. *Burrill Circ. Ev., pp. 488, 489.*

THOMAS SIMS testified that prisoner stated that Hinkle

moved him from Washington county, and put him off at the depot in Clarksville; that he stopped at Argenta and staid there about two days, and while there went over to Little Rock; and the hotel keeper carried his wife and child to the train; and he went on to Poplar Bluff, and staid there two weeks; and that the woman and child he was accused of killing died there.

W. J. SMITH testified that prisoner stated to him that he staid in Argenta two weeks.

J. R. YOUNG testified that he went to Kentucky and brought prisoner back to this state on a requisition from our governor. That on the road to Mayfield depot, prisoner said his wife and child had died twenty-five or thirty miles from Poplar Bluff. That Capt. Bush had told him he was charged with murdering his wife. Prisoner said the child died about six hours before the woman; that they died on the railroad, and he buried them. That he stopped all night at Argenta and three days at Poplar Bluff. That Hinkle left him somewhere close to Stout's, where he staid all night, and on his return he took the train at Clarksville.

A. J. NICHOLS testified that prisoner told him that Hinkle brought him from Washington county, and set him down in Clarksville, and that he took the first down train, and he and his wife registered at the hotel in Argenta; that he could make the hotel-keeper (Barna) remember him, because he had assisted him in getting through the quarantine, and he could be identified at Clarksville. That when he left Clarksville the child was having chills. That the woman and child both died at Poplar Bluff, and he buried them there. Witness was certain that prisoner said that Hinkle put him off at the depot at Clarksville. Witness asked him if he did not get

off at Stout's, at the boat landing, and he said he did not. Witness went with him to Dardanelle, when he applied for bail, and talked with him a good deal; was in charge of the jail, etc.

T. F. Hodnett testified that he had had a great deal to do with prisoner, and often heard him say that Hinkle carried him to the river, and, not finding a boat, he went back to the railroad and on to Argenta, where he staid over night. That his wife and child died near Poplar Bluff, and he staid at that place several days—did not say how they died; said he staid at the river two or three days.

J. T. Tracy, of Livingston county, Kentucky, and brother-in-law of prisoner, testified that prisoner got back there twenty-second of August, 1878, and told him that Julia Alsbrook had a child in Arkansas, and that she and the child died on the Iron Mountain railroad, on their way to Kentucky, and were buried there.

Prisoner was arrested at the house (or in the field) of W. D. Edmonds, his brother, to whom he made no statement as to what had become of Julia Alsbrook and her child.

W. W. Loyl, Kentucky witness and brother of prisoner's wife, testified that prisoner told him that Julia Alsbrook and her child had died, and that he buried them on the Iron Mountain railroad, the other side of Poplar Bluff.

The above statements of the prisoner to the several witnesses were voluntary, and made at different times and places.

They must have made an unfavorable impression upon the jury, and he had better been silent, as he had the right to be. *Perkins v. State, 60 Ala., 9.*

No doubt Hinkle took the prisoner to Pratt's Landing,

and he remained in that neighborhood for several days. If he took Julia Alsbrook and her child from the river to Clarksville, and on the train to Argenta, etc., the jury must have wondered why their bonnets, etc., were left on the bank of the river, and the sachel containing their clothing, etc., left in the corner of a fence.

The jury must also have thought it marvelous that he could have taken the woman and child from the river to Clarksville, thence on a public train to a hotel in Argenta, and thence on the Iron Mountain railway to or near Poplar Bluff; that they sickened, died, and were buried there, and yet no witness could be produced who ever saw them after Hinkle left them at Pratt's Landing. Did the prisoner, without assistance, nurse them in their sickness, and, without help, dig their graves and bury them in secret?

Several of his zealous Kentucky witnesses appear to have put themselves to the trouble to come to Clarksville, look at the skull found on the sand bar below Pratt's Landing, return home, and, in depositions, give their opinions that it was not Julia Alsbrook's skull.

Would it not have been as little trouble and travel for them, under the directions of the prisoner, to have found the grave where he buried her, exhumed her body and identified her true remains?

The prisoner left the vicinity of Pratt's Landing, perhaps, about the sixteenth or seventeenth, and was in Livingston county, Kentucky, on the twenty second of August —there was not much time for the sickness, death and burial of the woman and child on the trip.

All these matters, however, were for the consideration of the jury.

XX. MOTIVE OF THE CRIME. Except in rare instances of brutal and blood-thirsty criminals, there is usually a motive for murder.

There was evidence that the prisoner was kind to the woman while they were in Washington county, and on the journey to Pratt's Landing, and this was a circumstance in his favor, as the court charged the jury.

There was also evidence that she was dissatisfied with her life in Arkansas, and wished to return to Kentucky.

The jury must have concluded that the motive of the crime was to get rid of her.

The jury and the presiding judge heard all the evidence, and part of it—that relating to the skull, etc., which was before them—they understood better than we do. Upon a careful examination of the whole case, we shall leave the unfortunate prisoner where the verdict of the jury and the judgment of the court below placed him. We have found in the record no material error of law that could probably have been of prejudice to the prisoner; and we could not award a new trial on the evidence without a departure from a long and well-established rule of this court, founded upon a just view of the respective provinces of court and jury under our judicial system.

We should have been better satisfied in affirming the judgment if the proof of the *corpus delicti* had been clearer and stronger.

We have a strong moral conviction that Julia Alsbrook and her child perished in the river at Pratt's Landing But for the contradictory statements of the prisoner, it might possibly have been conjectured that he abandoned them there, and that the fallen woman, through shame and despair, terminated her existence and that of her child by a baptism of death. There is nothing, however, in the

record to indicate that her temperament was of a character to lead her to such an act. She seems to have been of a cheerful disposition, and manifested no feeling that she had fallen, or was leading a life of shame.