# Danny Jerome SIMS v. STATE of Arkansas

CR 75-85                                    530 S.W. 2d 182

## Opinion delivered December 8, 1975

*Bill E. Ross*, Public Defender, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *Terry R. Kirkpatrick*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant Sims was tried and found guilty of murder of Mrs. Hazel Elmore in the perpetration of an armed robbery and sentenced to life imprisonment. We find it necessary to reverse that sentence and judgment upon appellant's first ground for reversal, viz:

> CONSTITUTIONAL RIGHTS OF APPELLANT WERE VIOLATED IN THAT APPOINTED COUNSEL FOR APPELLANT WAS NOT NOTIFIED OF A PRETRIAL LINE-UP HELD ONE WEEK PRIOR TO THE TRIAL.

The record indicates that Charles Banks, as public defender, was appointed to represent Sims as early as March, 1974. His trial commenced on October 21, 1974. Clay Elmore, the husband of Mrs. Hazel Elmore, was also a victim of the robbery during which his wife was killed. The robbery took place on March 31, 1973, at Elmore's service station just off the Highway 140 exit from Interstate Highway 55 near Osceola. He was found wounded and bleeding, lying along the roadside approximately 175 feet from his station, yelling for help. He was taken to the emergency room at Osceola Hospital and arrived there about midnight. Officer Garland Bobo of the Osceola Police Department was on duty there and saw Elmore come to the door of the emergency room crying in a loud, terrified voice that he had been shot. Bobo observed that Elmore had been wounded in his left shoulder and hand by gunfire. He said that Elmore appeared to be in shock. After emergency treatment Bobo rode in an ambulance in which Elmore was transported to a Memphis hospital. Bobo returned about 3:00 a.m. and made a check on certain things, as he had been requested to do by Elmore, who gave Bobo the keys to the station.

While at the hospital, Elmore first told Bobo two black males were the robbers and later said there were three. He was unable to give any other description that night. Bobo also testified that en route to the Memphis hospital Elmore gave him a description of three categories of Chevrolet automobile

used by the robbers. According to Bobo, Elmore said the car in which the robbers left was a small new two-tone Chevrolet but gave three different colors. Bobo mentioned the colors blue and black in his testimony but said that he might have recorded them as green and black. Bobo said that at this time Elmore seemed to be in a daze, with consciousness coming and going.

Lt. Moore, Criminal Investigator for the Osceola Police Department, said that he was aware that three black males named Myron Franklin, Robert Earl Richmond and Otis Franklin had been arrested on the morning of Sunday, April 1 on Elmore's description of the automobile. These three, who were apprehended as they approached Osceola from the Interstate Highway, were photographed and fingerprinted while they were in custody for about an hour and a half. Moore took a stack of photographs which included photographs of these three persons to the hospital in Memphis later in the week and showed all of them to Elmore, who picked out the photographs of these three. Moore said that Elmore was under medication and in no condition to give further information. He stated that it was evident that Elmore was not coherent or mentally alert at the time.

When Clay Elmore was called as a witness, Banks requested an in camera hearing, saying that he anticipated that Elmore would be asked to identify appellant. Banks sought the hearing in order to explore the facts pertaining to a lineup identification of Sims by Elmore at the jail in Osceola during the week preceding the trial, in the absence of Banks. The prosecuting attorney candidly admitted that the lineup was held and that Elmore had then positively identified Sims as one of the three persons who participated in the robbery and murder of Mrs. Elmore. The prosecuting attorney stated that he did not propose to make any mention of the lineup, because Elmore had said that he could identify Sims upon the basis of the opportunity to observe him during the commission of the crime, and not from viewing him in the lineup.[1] He further explained that the lineup was for the state's benefit in

[1] It should be noted that Elmore did not appear and testify at this hearing. His purported ability to identify the robber was stated only by the prosecuting attorney's recall of statements purportedly made by Elmore.

order to determine whether Elmore could positively and without doubt identify Sims as one of those guilty of the crime. The trial judge suppressed any and all facts, circumstances and statements pertaining to the lineup, but held that the state would be permitted to call Elmore for the purpose of identifying Sims, if he could, even though nothing could be said about a lineup. The court also expressly gave defense counsel permission to go into the matter during this testimony.

On direct examination, Elmore positively identified Sims, saying that he first saw appellant standing in the door of the service station with a rifle in his hand. He related the story of the brutal murder of his wife in the men's restroom, saying that Sims stood at least three feet away in the door with his rifle, while another robber shot her twice with a pistol. A third shot wounded Elmore. Elmore said that the whole episode covered a period of about four minutes.

On cross-examination, Elmore admitted that his testimony was highly emotional, as might be expected. Elmore said he had gone to Blytheville to see Sims in the jail there, because he just wanted to look at him, but the sheriff would not permit him to do so. He admitted having been present when Sims was arraigned at the preceding term of court. When asked to describe Sims without looking at him, Elmore said that he did not measure the defendant to see how tall he was and didn't know how much he weighed. He said that at the time of the robbery Sims' hair "bushed out" more than it did in the courtroom. He could not describe the clothing worn at the time of the robbery by the man he said was Sims. He admitted having seen Sims a few days previously in court and when, on another occasion, a sheriff's office had brought Sims to the lobby of the courthouse for a drink of water, as well as on the occasion of the lineup. Elmore said that all those in the lineup were dressed alike and wore white shirts. Although he said he only wore glasses when making out credit cards, he put them on when he viewed Sims in the lineup at the jail, because he had to look through two "bunches" of wire and wanted to be sure. He also stated that when he saw Sims, he did not look at the four other persons in the lineup. Elmore testified that he did not remember being shown any

photographs the evening of April 7 at the hospital in Memphis, saying that he was "doped up" at the time. Elmore said that the whole robbery episode occurred "pretty fast" and that his back was toward the robbers when he and his wife were taken to the bathroom where she was killed and he was shot.

No testimony about the composition of the lineup or what occurred at that time except that of Elmore appears in the record. It is clear that Banks had been appointed as appellant's attorney at that time but was neither present nor notified. At the conclusion of the state's evidence, appellant moved for a directed verdict because there was no evidence to connect him with the crime other than Elmore's identification.

The Attorney General candidly admits that appellant and his attorney should have been notified of the lineup and the attorney given an opportunity to be present in order to meet the constitutional requirements set out in *United States* v. *Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed 2d 1149 and *Gilbert* v. *California*, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178. He also agrees that when a lineup is conducted without the presence of accused's counsel, the State must establish by clear and convincing evidence that the subsequent courtroom identification by a witness who identified the accused in such a lineup was based upon independent observation rather than upon the constitutionally infirm lineup procedure. *Montgomery* v. *State*, 251 Ark. 645, 473 S.W. 2d 885; *United States* v. *Wade*, supra. On this point, the state relies entirely upon the argument that there was clear and convincing evidence that Elmore's courtroom testimony was not tainted by the lineup.

This question has troubled us considerably. We recognize that the circuit judge had an advantage this court does not, because of his opportunity to observe the witness and his courtroom identification. If only a simple preponderance of the evidence was sufficient to establish that Elmore's courtroom identification was not tainted, we might well hold with the state in this case. We might have to rely upon the trial judge's findings because we could not say they

were clearly against the preponderance of the evidence. But when we look to the *Wade* tests, we cannot say that the requirements of *Wade* recognized in *Montgomery* were met on the record before us, particularly in view of the fact that the only real issue in the case, i.e., identification of Sims, turned upon this testimony alone, as appellant's attorney aptly pointed out in the trial court. It is also significant that here, as in *Wade*, the lineup was conducted to "crystallize the [witness'] identification of the defendant for future reference." In *Wade*, some factors to be considered in determining whether the identification was tainted were enumerated as examples. Among them were:

1. Prior opportunity to observe the criminal act.

2. The existence of any discrepancies between any pre-lineup description and the defendant's actual description.

3. Any pre-lineup identification of another person.

4. Lapse of time between the alleged act and the lineup identification.

5. Facts disclosed concerning the conduct of the lineup.

The opportunity of Elmore to observe the robber he said was Sims was probably sufficient, although it was subject to some limitations. Regardless of the reasons, there were discrepancies between pre-lineup descriptions and pre-lineup identifications of others and the description of Sims and his in-court identification. There was a lapse of more than 18 months between the crime and the trial, during which Elmore may well have been influenced by suggestion, arising from his having observed the accused in custody and at pre-trial proceedings. No doubt these matters raised a question in the minds of those conducting the prosecution about Elmore's ability to eliminate any reasonable doubt about the identity of this person who participated in the robbery. This question was serious enough to cause them to satisfy themselves about Elmore's ability in this important respect in the absence of defense counsel, who would undoubtedly seize

upon any hesitation on the part of Elmore and any additional discrepancies that might arise. However commendable their motivation to be sure that they were not asking a jury to convict the defendant of a serious crime upon uncertain testimony, the method pursued did not pass constitutional muster. The very basic purpose of *Wade* and *Gilbert*, i.e., to permit accused's counsel to be prepared for searching cross-examination, was subverted.

In a dissent it is urged that we should consider the failure to advise appellant's attorney of the lineup as harmless error. This suggestion overlooks the fact that the failure to advise the attorney is not the issue. The question is whether the in-court identification of appellant was tainted by an unconstitutionally conducted lineup and inadmissible for that reason. We cannot say that the error was harmless when there is absolutely no other evidence to connect appellant with the crime, and appellant was deprived of his attorney's ability to cross-examine the identifying witness about the lineup from personal observation of the proceeding. As we understand the rule, before an error of constitutional proportions may be considered harmless, it must be harmless beyond a reasonable doubt, and we must be able to say that untainted evidence of the defendant's guilt was overwhelming before we can even consider whether the error is harmless. *Harrington* v. *California*, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284; *Freeman* v. *State*, 258 Ark. 617, 527 S.W. 2d 909 (1975). Of course, when, as here, there is no other evidence, the harmless error rule cannot be applied.

We are not ignorant of the record of appellant's testimony on motion to suppress an alleged confession for involuntariness, which was suppressed by the circuit judge. We are fully aware of the fact that, on cross-examination of Sims at this hearing in chambers, the following took place:

Q. Well, your accomplices, Freddy Orr and this Charles Coleman, were present with you at the time of this killing, weren't they, and, or you were present with them there?

A. Yes.

Q. So when you confessed to participating in this robbery, and—

MR. BANKS: If the Court please, we are going to object to that line of questioning. I don't see it is relevant to this particular hearing on the voluntariness.

COURT: What was your question?

MR. PEARSON: When he confessed to participating in this robbery and confessed to participating in this killing it was true?

A. I had done—

COURT: The objection will be overruled.

A. I had done listened to the statement Orr and Coleman had given to the Sheriff, and I know exactly what they had.

Q. When you had denied to the sheriff and the officers present several times, that you weren't there and didn't participate and didn't know anything about it, you were lying, weren't you?

MR. BANKS: If the Court please, your honor, I have to object to that point also. He is requiring this man to testify against himself, and we are here to determine whether or not this confession is voluntary on his part; not to go into what the confession is.

MR. PEARSON: It goes to his credibility, your honor.

COURT: This objection will be sustained.

Q. All right, you did at first deny several times having participated in or been present at the time of the killing, did not not?

A. Right.

Q. And later then did make a truthful statement to them as to your part in the robbery and killing, did not not?

A. Yes, on tape.

Q. Why did you, after first denying it, then change your mind and tell them the truth about what happened?

A. Because I was—

MR. BANKS: If the Court please, your honor, I am sorry to have to object, but the prosecuting attorney is couching his questions in terms to make this man testify against himself. He is not asking him something about the voluntariness of the confession. He is asking about whether or not he told the truth.

COURT: The objection will be overruled. You may proceed.

It is self-evident these answers could not possibly have been used by the state as evidence-in-chief. Even though the court's rulings on the objections made by appellant's attorney seem inconsistent, the questions were improper and the answers could not be considered for any purpose, even on the question of voluntariness. *Lego* v. *Twomey*, 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *Rhone* v. *State*, 254 S. 2d 750 (Miss., 1971); *Washington* v. *Commonwealth*, 214 Va. 737, 204 S.E. 2d 266 (1974); *State* v. *Burke*, 27 Wis. 2d 244, 133 N.W. 2d 753 (1965); *State* v. *Thomas*, 208 La. 548, 23 S. 2d 212 (1945); *Isbell* v. *State*, 44 Ala. App. 69, 202 S. 2d 555 (1967); *U.S.* v. *Inman*, 352 F. 2d 954 (4th Cir.) (1965); *People* v. *Lacy*, 25 A.D. 2d 788, 270 N.Y.S. 2d 1014 (1966). Even if appellant had not objected to the questions asked him in camera, his answers would not have been admissible during the jury trial. *Hawkins* v. *State*, 193 Miss. 586, 10 S. 2d 678 (1942). An accused has the right to limit his testimony in a Denno hearing to the question of voluntariness of an alleged confession, and neither his testimony relating to this issue nor his failure to object to cross-examination on the merits of the case is a waiver of his constitutional right against self-incrimination. *Hawkins* v. *State*, supra; *Washington* v. *Com-*

*monwealth,* supra; *People* v. *Walker,* 374 Mich. 331, 132 N.W. 2d 87 (1965). See also, *State* v. *Burke,* supra; *State* v. *Thomas,* supra.

Any doubt about the inadmissibility of admissions wrung from the accused by this cross-examination is laid to rest by *Simmons* v. *United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). In that case, the court said:

> The rule adopted by the courts below does not merely impose upon a defendant a condition which may deter him from asserting a Fourth Amendment objection—it imposes a condition of a kind to which this Court has always been peculiarly sensitive. For a defendant who wishes to establish standing must do so at the risk that the words which he utters may later be used to incriminate him. Those courts which have allowed the admission of testimony given to establish standing have reasoned that there is no violation of the Fifth Amendment's Self-Incrimination Clause because the testimony was voluntary. As an abstract matter, this may well be true. A defendant is "compelled" to testify in support of a motion to suppress only in the sense that if he refrains from testifying he will have to forgo a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit. However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit. When this assumption is applied to a situation in which the "benefit" to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

True it is that this langugage was used with reference to a motion to suppress the fruits of a search and seizure, but it has been applied to cases involving confessions. *Lindsey* v. *Craven*, 365 F. Supp. 948 (C.D. Cal., 1973). We cannot conceive of any reason that could be given for not applying the rule of *Simmons* to any and all motions to suppress evidence.

We do not mean to say that Elmore's testimony must necessarily be excluded on a retrial if testimony other than that before us should be developed. Here, as in *Gilbert*, we are told little about what occurred at the lineup. For instance, the only testimony about the composition of the lineup was that of Elmore that all five persons wore white shirts. No one ever undertook to show any resemblance or differences in the appearances of the people whose photographs Elmore picked out and the perpetrators of the crime, or any reason for misidentification and misdescription other than that Elmore was under medication and perhaps in shock.

We have heretofore avoided requiring an independent hearing of the *Denno* type in every case where the admissibility of in-court identification testimony is questioned on the assertion that it is tainted by pretrial procedures. We have recently held that such a hearing should be conducted in a particular case. *Wright* v. *State*, 258 Ark. 651, 528 S.W. 2d 905 (1975). This is another such case. The time has come to address ourselves more directly to the basic question whether such hearings are required. Under our own law, there are many inquiries that might be addressed to the question of admissibility, that could not be permitted in eliciting direct evidence. See *Trimble & Williams* v. *State*, 227 Ark. 867, 302 S.W. 2d 83; *Spivey & Payne* v. *State*, 247 Ark. 752, 447 S.W. 2d 846. It is extremely difficult to determine the question of admissibility when the entire examination, particularly direct examination, is conducted in the presence of the jury. There is, to say the least, a strong suggestion in a statement of the United States Supreme Court in *Gilbert* v. *California*, supra, viz: "The admission of the in-court identification without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error." We are fully aware of the fact that this specific question was not raised in the trial court, but it seems essential that we treat it for the guidance of the court on retrial. We

now conclude that, in cases tried after this date, an in-chambers hearing should be conducted to determine admissibility of in-court identification testimony whenever an objection is made on the ground that it is tainted by unconstitutional pretrial identification lineup or "showup" procedures. It may well be that the trial court cannot make a final determination without a courtroom attempt at identification, but this should not be done in the presence of the jury. Furthermore, in such a hearing witnesses other than the person giving identification testimony may be heard on the question of admissibility, even though their testimony might not be admissible in the trial. In this case the state, on the record before us, has not met its burden of proof on the admissibility of the identification. On retrial, other available evidence on the subject should be heard.

There are other questions which are not likely to arise upon a new trial. We will discuss those that are likely to arise, i.e., the argument that the evidence of death was insufficient and that a mistrial should have been declared on account of statements of the prosecuting attorney in closing argument.

There was testimony as to cause of death by a mortician. Police Officer Riney found Mrs. Elmore lying on the service station restroom floor on which he saw bloodstains near the spot where her head was lying. He found no pulse, but did find two gunshot wounds, one of which was in her head and the other in her breast. She appeared to him to be dead. The mortician, who had examined many bodies with gunshot wounds during his 30 years of experience, and who had also had occasion to ascertain from powder burns the proximity of a weapon inflicting a wound in bodies, found a bullet hole about an inch below Mrs. Elmore's left breast, which he classified as an entrance wound because of the presence of powder burns. He found an exit wound about one inch below her right shoulder blade. He found in her left ear a wound he called an entry wound because of powder burns, and a larger exit wound about one inch below and one inch to the right of her right ear. He testified that Mrs. Elmore was dead and that in his opinion her death was caused by these gunshot wounds. Mrs. Elmore's body was at the hospital when he picked it up. A photograph of Mrs. Elmore's body as it was

found on the restroom floor was made and introduced. Elmore testified that he left his wife because he knew she was dead.

Appellant's argument on this point apparently hinges upon the absence of evidence of the results of an autopsy or a medical doctor's opinion of the cause of death. This is not required in every case. We have heretofore held that Ark. Stat. Ann. § 42-611 et seq. (Supp. 1973) did not affect the admissibility of evidence of death or the cause of death of a victim of a crime by a medical expert on or an autopsy report prepared by a medical expert other than the state medical examiner. *Stewart* v. *State*, 257 Ark. 754, 519 S.W. 2d 733. We have also held that the testimony of an attending physician or surgeon on the subject may be admitted without reference to an autopsy. *Stewart* v. *State*, supra. Furthermore, expert testimony is not always required. No statute or judicial decision has impaired the efficacy of *Edmonds* v. *State*, 34 Ark. 720, where we held that both the fact of death and cause of death might be shown by strong and unequivocal circumstantial evidence such as to leave no ground for reasonable doubt, and that, where there is some proof of the corpus delecti, its weight and sufficiency is properly left to the jury. See also, *McDaniels* v. *State*, 187 Ark. 1163, 63 S.W. 2d 335. It has been said that the most satisfactory evidence of the fact of death is the testimony of those who were present when it happened or who, having been personally acquainted with the deceased, have seen and recognized his body after life is extinct. *Cavaness* v. *State*, 43 Ark. 331. There is no requirement that there be medical testimony. *Glover* v. *State*, 211 Ark. 1002, 204 S.W. 2d 373.

In *McDaniels* we held the evidence sufficient to show cause of death when it was shown that a deceased was shot through the left eye, below the heart and in the leg and that an undertaker shortly thereafter took charge of the body. We also took into consideration there direct and positive testimony of the undertaker that the victim was shot in such a manner as to produce death. The evidence here was sufficient. See *Mosby* v. *State*, 253 Ark. 904, 489 S.W. 2d 799; *Johnson* v. *State*, 120 Ark. 193, 179 S.W. 361; *Outler* v. *State*, 154 Ark. 598, 243 S.W. 851.

Appellant objected to the prosecuting attorney's reference to testimony as uncontradicted and undenied, as a comment on defendant's failure to testify, and moved for a mistrial. Overruling the objection and refusing to declare a mistrial was not error. *Moore* v. *State*, 244 Ark. 1197, 429 S.W. 2d 122; *Edens* v. *State*, 235 Ark. 996, 363 S.W. 2d 923; *Ferrell* v. *State*, 177 Ark. 742, 9 S.W. 2d 15; *Davis* v. *State*, 96 Ark. 7, 130 S.W. 2d 547.

The judgment is reversed and the cause remanded for a new trial.

Jones, J., dissents.

Roy, J., not participating.

J. Fred Jones, Justice, dissenting. I do not agree with the majority opinion that the conviction should be reversed in this case.

This was a typical filling station robbery case attended by the additional feature of murder to avoid future identification which is also becoming typical in robbery cases. In the case at bar three individuals drove into a filling station attended by Mr. Elmore and his wife and while one of them waited in their automobile the other two confronted Mr. and Mrs. Elmore with rifles and emptied the cash register without difficulty and without resistance. One of the robbers took Mr. Elmore's .38 caliber revolver from near the cash register. They herded the Elmores into a restroom and while one of them barred the door with a rifle, the other one executed Mrs. Elmore by shooting her through the chest and through the head with the revolver. They then attempted to execute Mr. Elmore, the only remaining eyewitness, by shooting him with the revolver but his gunshot wounds were not fatal. The robbers then drove away with ample reason to believe there would be no living person who could identify them if they were ever apprehended; and, that their constitutional rights, if properly pleaded and presented by court appointed counsel, would fully protect and insulate them against possible conviction on circumstantial evidence.

Apparently two of the robbers, Orr and Coleman, were apprehended in Missouri and made tape recorded confessions in which they implicated the appellant Sims as the third member of the trio. Sims was taken into custody and after hearing the recorded statements of the other two, he apparently also made a recorded confession, but his confession was suppressed as involuntary by the trial court partially because the interrogation continued after Sims, in effect, said he had nothing to say. At the in-chambers "*Denno*" hearing on the motion to suppress, Sims admitted that he was with Orr and Coleman when the crimes were committed. As abstracted in appellant's brief, Sims said: "Yes Freddie Orr and Charles Coleman were present with me at the time of this killing and I was present with them." This statement was made outside the hearing of the jury and I only mention it here as preface for my opinion that Mr. Elmore did not identify the wrong man at the trial or in the line-up.

I do not suggest that the trial court erred in suppressing Sims' confession. Neither does the majority or anyone else suggest that Mr. Elmore identified the wrong man. Sims was placed in a line-up and was readily identified by the surviving victim. The majority reverses this case, and thereby nullifies the in-court identification by the only eyewitness and surviving victim of the crime, simply because the appellant's court-appointed attorney was not notified of the time and place of the line-up. There is no question in my mind that Mr. Elmore made his in-court identification of Sims from the ordeal he experienced when his wife was murdered and he was wounded under the inside lights of his filling station rather than from seeing Sims in a line-up.

Mr. Elmore said he was not seeking the life of the appellant Sims because Sims was not the one who killed his wife. He said that the first time he saw Sims he was standing by the office door in his filling station with a rifle in his hands. He said another person was also in the main part of the filling station and that he likewise had a rifle. He then testified in part as follows:

"Q. Where in the station was your wife shot and killed?

A. In the bathroom; the men's bathroom.

Q. Were you present there?

A. Yes, sir.

Q. And was this defendant present there?

A. Yes, sir.

Q. Where?

A. Right at the door, sir.

Q. What was he carrying at that time?

A. He was carrying a rifle.

Q. Did he himself shoot you or your wife?

A. He did not shoot my wife.

Q. The other man did?

A. The other man did.

Q. What did he shoot her with?

A. Sir?

Q. What did he shoot her with?

A. A .38 calibre pistol.

Q. Do you know where the pistol came from?

A. It was my pistol. It came from the side of the cash register or out of the drawer there.

Q. Do you know how many shots were fired?

A. Five shots.

Q. In the restroom?

A. In the restroom, yes, sir."

Mr. Elmore said it was between 11:00 and 12:00 o'clock at night when the men stopped at his filling station. He said he did not pay a great deal of attention to them until after he had serviced a car and it had left. He said he then went back into the filling station; that one of the men was at the telephone, and he then testified as follows:

"A. ... [O]ne was sitting on the water fountain and he throwed a rifle on me and said 'Turn out your lights just like you're closing up.'

Q. And was that this defendant?

A. No, sir, it was another one.

Q. And did you do that?

A. Yes, sir.

Q. Did you turn off your lights just like you were closing up?

A. Yes, sir.

Q. Then what happened?

A. We opened the cash register and told them to take what they wanted and don't hurt us.

Q. Did you open your cash register?

A. My wife did.

Q. And did you or your wife tell this defendant, take what you want, and don't hurt you?

A. Yes, sir.

Q. Did they say anything before the shooting?

A. They said that we would identify them.

Q. Said what?

A. They said that we would identify them.

Q. Did this defendant make that statement to you?

A. No, sir, the other one made that statement to me.

Q. Then what happened?

A. They got the money and told us to go in the bathroom, and tried to put us in the same coat.

Q. Tried what now?

A. Tried to put us in the same coat together.

Q. Coat?

A. Yes, sir.

Q. I don't understand what you are talking about.

A. Just a coat like you wear, an old army jacket, I believe.

Q. They wanted to put both you and your wife in that?

A. Yes, sir.

Q. You mean put both your arms in the same coat?

A. Yes, sir.

Q. What happened then?

A. They shot my wife and I grabbed her and let her down to the floor.

Q. Who shot her?

A. The other guy that was with him. I don't know his name.

Q. But he shot your wife and you grabbed her?

A. And I grabbed her and let her down.

Q. Then what happened?

A. The second shot fired, he was still shooting at her. The third shot hit me, and went in right there and came out there (indicating). I bent over.

Q. Were you shot more than once?

A. I was shot three times, yes, sir.

Q. When the shooting was going on, where was this defendant standing?

A. He was standing in the bathroom door to keep us in there.

Q. You think he was standing there to keep you from running out of the room?

A. Yes, sir.

Q. How close to you and your wife was he, holding his rifle to hold you in there?

A. I would say at least three feet."

It is obvious from Mr. Elmore's testimony on direct examination the he had ample opportunity to see his assailants.

The basis of Mr. Elmore's identification of Sims was clearly brought out on his cross-examination. On cross-examination Mr. Elmore testified in part as follows:

"Q. Mr. Elmore, the testimony that you have just given indicates that you identified positively that Danny Sims took part in that night of events?

A. Yes, sir.

Q. And the testimony that you have given here before this jury is what we would consider highly emotional?

A. Yes, sir.

Q. This is something I would like to express my sincere sympathy for you in your tragic loss. What we are here for, as you will understand, is the most positive proof in order that we may achieve justice. Is that correct?

A. That is correct.

Q. And we want to be positive beyond any doubt that no mistake has been made. Is that correct?

A. That is correct.

Q. Are you telling me and telling this jury that you are positive you have not made a mistake?

A. I am telling you that that is the man, so God be my helper.

* * *

A. I don't want this man's life. He didn't kill my wife. This man didn't.

* * *

Q. . . . Tell us again how you noticed this particular individual there at your station?

A. When a man has come in to rob you, you look at him good. When they say that you will identify them if they didn't hurt you, you look at them better.

Q. I believe you testified on direct examination that when they first came in, they used the phone?

A. Yes, sir.

Q. So you didn't know at that point that they were going to rob you?

A. No, sir.

Q. Then how can you tell the jury you started making such a good identification of them?

A. Because when they throwed rifles on me, I looked at them.

Q. You looked at them instead of the rifles?

A. Yes, sir.

Q. I assume you were in fear of your life? Is that correct?

A. I said I looked at them real good.

Q. And you stood in open court and you looked around the entire courtroom and picked out Danny Sims as one man in your station that night with a rifle?

A. Yes, sir.

* * *

Q. How was his hair? Long or short?

A. His hair was bushed out more than it is now.

Q. How was he dressed?

A. I don't recall his dress because I was looking straight in the face.

Q. Did you look at the other two?

A. No, sir, one didn't get out of the car. I didn't see him.

Q. One didn't get out of the car?

A. One didn't get out of the car.

Q. What did the other one look like?

A. The other had a large neck, a little darker complected than Danny Sims; a little higher; a little heavier.

Q. I believe you stated that on direct examination that they turned the lights out? Is that right?

A. They turned part of the lights out, yes, sir.

Q. What part did they turn out?

A. All my outside lights. We left the inside lights on; just like I was closing up.

Q. They didn't turn the inside lights off?

A. No, sir.

Q. You are positive of that?

A. I am sure of it.

Q. Was the bathroom light on?

A. Yes, sir."

Mr. Elmore was then questioned by the defense counsel as to the line-up procedure. He said that in the line-up there were five men all wearing white shirts, and that he recognized the appellant Sims as soon as he saw him and did not pay too much attention to the other individuals in the line-up. He was asked to describe the other individuals in the line-up and he said:

"A. After I saw Danny, I didn't look at the rest of them. I turned and walked out.

Q. You didn't look at them at all?

A.   I knowed him at the time I saw him."

Mr. Elmore positively and emphatically identified Sims at the trial as the robber who confronted him with the rifle and the one who barred the restroom door while his wife was being executed with his own revolver and with which he was also shot. The fact that Mr. Elmore exonerated Sims as the one who actually did the shooting adds credit to his identification. The line-up identification was not mentioned by the prosecution at the trial and although it was mentioned by defense counsel, there was nothing whatever to suggest that the prosecuting witness Mr. Elmore may have identified the wrong person at the line-up or at the trial, or that his in-court identification was based at all on his line-up observation.

Certainly the police officers should be censored for not advising Sims' attorney of the time and place of the intended line-up, but there is nothing to indicate the line-up was improperly conducted or in any way suggestive. To reverse this case and thereby nullify the in-court identification by the only living victim who looked his assailant in the face while the crime was being committed, simply because Sims' attorney was not called to attend the line-up is, in my opinion, putting form above substance, under the evidence in this case. Certainly this court should be concerned with whether the prosecuting witness identified the wrong man, but to reverse this case because of the dereliction of the police officers in not advising the appellant's attorney of the intended line-up is to reverse the conviction because of harmless error.

I am not unmindful of the United States Supreme Court decision in *United States* v. *Wade*, 388 U.S. 218, 87 S. Ct. 1926 (1967). In the trial of that case two bank employees, who had been robbed, when asked on direct examination if the robber was in the courtroom, simply pointed to Wade. The prior line-up identification without knowledge of Wade's attorney was then elicited from both employees on cross-examination, and the Supreme Court disposed of that case as follows:

"We, therefore, think the appropriate procedure to be followed is to vacate the conviction to determine whether the in-court identification had an independent

> source, or whether in any event, the introduction of the evidence was harmless error."

We have no record of what occurred at the retrial of Wade if he was again brought to trial. Perhaps the two bank employees testified on retrial that they would never forget the look on Wade's face or the expression in his eyes when he said, "Hand over the money or I will kill you," and that their in-court identification was based on such independent face-to-face encounter, rather than on seeing him again in the police line-up. If such was the testimony at retrial, in all probability Wade was again convicted. On the other hand it is possible the prosecuting witnesses may have testified at the retrial as they apparently did at the first trial. "We saw the defendant at a police line-up — he is now in the courtroom and that is the man."

It is obvious to me that the decision in *Wade* was left open for just such logical procedure. The "independent source" referred to in *Wade* could only have meant "independent of the line-up identification." Surely the Supreme Court did not remand the *Wade* case to be retried in a vacuum, neither did it remand *Wade* for further inquiry as to the procedure at the *line-up identification*. It remanded *Wade* for further inquiry as to the *in-court identification* and whether it was from some source independent of the line-up identification.

Also in *Gilbert v. California*, 388 U.S. 263, the Supreme Court held that the admission of in-court identifications without first determining that they were of independent origin and not tainted by an illegal line-up was constitutional error, but in that case the court also said:

> "However, as in *Wade*, the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source. Gilbert is therefore entitled only to a vacation of his conviction pending the holding of such proceedings as the California Supreme Court may deem appropriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that

their introduction in evidence was in any event harmless error."

I am thoroughly convinced that in the case at bar there was ample evidence of pre-trial identification of Sims totally independent of the line-up identification, and that the evidence already exists in this case that was required by the Supreme Court upon remand in *Wade* and *Gilbert.*

The majority point out that Mr. Elmore had seen the appellant Sims at other times during Sims' pre-trial incarceration and indicate that Elmore might have been influenced thereby to some extent in his in-court identification. Surely the majority would not void an in-court identification if the victim of a crime should by chance see the accused between the commission of the crime and the trial of the accused.

I am opposed to extending the requirements of *Wade* and *Gilbert* one bit beyond the requirements therein set out and as I perceive the plain language of those opinions to state. If Elmore's testimony, *supra,* did not reveal an independent source for his in-court identification, I cannot conceive of what could possibly become an independent source under the facts in this case. If the evidence in the case at bar does not meet "constitutional muster" under *Wade* and *Gilbert,* I think the court where that phrase was coined should say so in language better defining what would constitute an independent source.

Of course the United States Supreme Court will have no opportunity to better define "independent source" so long as state appellate courts conclude that it means something other than face-to-face confrontation at the commission of the crime and remand the cases to the trial court for additional inquiry into the validity of line-up identifications, or reverse and dismiss because of improper or tainted in-court identifications.

Sims personally and affirmatively elected to not testify in the case at bar and it is obvious to me from the clear and convincing evidence, that Mr. Elmore's in-court identification of Sims was based entirely on his observation of the accused

during the commission of the crimes and was not tainted in the slightest degree by the line-up procedure. It is furthermore my conclusion, that the failure to advise appellant's attorney when the line-up was to be conducted, was harmless error under the totality of the circumstances and evidence in this case.

I would affirm.