Alex WARE *v.* STATE of Arkansas

CR 01-910                                                75 S.W.3d 165

Supreme Court of Arkansas
Opinion delivered April 11, 2002

*Durrett & Coleman*, by: *Gerald A. Coleman*; and *Raymond Abramson*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

D ONALD L. CORBIN, Justice. Appellant Alex Ware appeals the judgment of the St. Francis County Circuit Court convicting him of two counts of capital murder and sen-

tencing him to a term of life imprisonment without the possibility of parole. On appeal, Ware argues that the trial court erred in: (1) denying his motion to quash the information and in failing to grant his motion for a directed verdict; (2) denying his motion for severance; (3) finding him competent to stand trial and denying his motion for a continuance; and (4) refusing to impose sanctions for a violation of the court's order limiting pretrial publicity. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

On June 18, 1999, Chantilly Harrell took her two sons, four-year-old K-Von and one-year-old Alexander, to visit Ware, their father, for the Father's Day weekend. Both Harrell and Ware lived in Memphis, Tennessee, at that time. Harrell had recently left Ware after a five-year relationship, because he had been abusive to her. On June 19, Ware phoned Harrell and stated, "I don't know what I've done with the children. You'll never see them again. You'll never trust me again. I don't know what I've done." Thereafter, Harrell contacted Memphis police and reported her conversation with Ware to Officer Christopher Wages. After being paged by Wages, Ware contacted police and told them that he would bring the children to the police department within a couple of hours, but he never appeared with the children.

On June 28, 1999, Memphis Police Officer Troy Shields received another call from Harrell regarding the whereabouts of her sons. Shields went to Ware's residence and discovered that it had been abandoned. Shields then contacted Ware expressing concern about the children's safety. Ware was evasive during this conversation and told Shields that he had not seen the boys since he returned them to their mother. Shields contacted Ware again the next day requesting assurances that the children were safe, but Ware was uncooperative, stating that he would not bring the children in until he cleared his name.

Harrell spoke with Ware on several different occasions between the time the boys disappeared in June and late August 1999. During one conversation, Ware told Harrell that he had thrown K-Von into a pond and that he had abandoned Alexander in some weeds. By the end of August, however, Ware's story

changed, and he told Harrell that if she wanted to see her children alive again, she would have to go with him to pick them up. Harrell notified her mother that she was going with Ware and asked her to contact police if a day passed without hearing from her. According to Harrell, Ware picked her up in Memphis at Court Square and initially drove her to a park located near the Mall of Memphis. Ware then pulled a gun on Harrell and told her that the children were alive, but that he had been trying "to break her spirit."

After leaving the park, Ware drove Harrell to Chicago, Illinois. During the drive, Ware repeatedly told Harrell that the children were fine and with nice people. Once in Chicago, Ware took Harrell to a cousin's house where two of Ware's children from a previous relationship, Shenna and Perez, were located. Harrell attempted to question Ware's children about the whereabouts of her own sons, but Ware retrieved his gun and a struggle ensued between him and Harrell. Ware then told Harrell that their children were dead and that she was never going to see them again. Immediately thereafter, Ware recanted and told Harrell that he would take her to the children the following day.

The next day, Ware drove Harrell and his two children to Detroit, Michigan, to the home of a great-aunt, but the two missing boys were not there. Ware again drove back to Chicago and dropped off his children. He and Harrell then went back to Detroit, before returning to Memphis. Ware told Harrell that he had some business to take care of in Memphis before he took her to Florida to get the children. Once in Memphis, Ware and Harrell checked into a room at the Bellevue Inn. Harrell then called her mother who in turn contacted the police and informed them that her daughter was being held against her will at the motel.

Memphis Police Officers Max Howard and Billy Smallwood went to the Bellevue Inn and made contact with Ware at approximately 2:00 a.m. on September 2, 1999. Initially, Ware gave officers a false name. Harrell informed the officers that Ware had taken her children somewhere, and she was trying to get them back. Ware then claimed that he had custody of the children. According to Smallwood, he initially believed that he was a deal-

ing with a situation involving parental kidnapping, but grew suspicious after Ware made repeated comments about death and parents who kill their children. After discovering that he was wanted for questioning regarding the whereabouts of two of his children, Howard and Smallwood took Ware into custody. While en route to the Shelby County Jail, the officers were discussing different situations involving murders and kidnappings when Ware interrupted them. According to Smallwood, Ware asked, "[I]f they can't find the bodies, can they still charge me with murder?" Smallwood stated that he did not initiate any conversation with Ware. Howard also testified that neither he nor Smallwood attempted to initiate a conversation with Ware, and that Ware interrupted their conversation. The only other statement made by Ware while in the patrol car was, "I might as well just kill myself, 'cause I'm not gonna go to prison like that."

Once at the police station, Ware was questioned by Sergeants Marcus Worthy and Donald Ray Dickerson. The officers advised Ware of his *Miranda* rights and asked if he would mind answering some questions. Worthy told Ware that the officers' primary concern was the whereabouts of the children. Initially, Ware told the officers that the kids were safe and happy. After Worthy made comments that the children deserved a proper burial by an ordained minister, Ware changed his story to state that Harrell had killed the children and that he had witnessed it. Ware then signed a typed copy of his statement and told the officers that he would show them where the children's bodies were located.

Thereafter, Ware took the officers to Arkansas, where they were met by officers from the St. Francis County Sheriff's Office. Ware first directed the officers to an area known as Blackfish Lake. Upon arriving at the scene, Ware attempted to remove his clothes and shoes and stated that he wanted to go into the lake to retrieve K-Von's body. Ware then took police to a wooded area next to a levee north of Widner Junction where Alexander was abandoned. After searching the lake, investigators were unable to locate the remains of K-Von, but did discover several bone fragments at the wooded site. A later search of this area also uncovered a child's sock and a t-shirt for a twelve- to eighteen-month-old child.

Initially, both Ware and Harrell were charged with two counts of capital murder and were transported from Memphis to St. Francis County on September 7, 1999. The pair were questioned separately by Officers Glenn Ramsey and Herbert Neighbors, beginning with Harrell. After giving an oral statement, Ware agreed to allow Ramsey to reduce the statement to writing. After reading it and verifying that it was accurate, Ware signed the statement. In that statement, Ware claimed that a couple of days after Harrell moved out with the children, she contacted him stating that she felt tied down at a young age by the two children and was stressed out. Ware then stated that Harrell came to his house on the morning of June 16 wanting to go for a ride over to Arkansas. During the drive, Harrell told Ware that she no longer wanted the children. Ware then described exiting Interstate 40 near Albert's Junkyard and turning down a gravel road where he stopped the car. According to Ware, Harrell got out of the car with Alexander, took off the child's shoes, kissed him on the head, and then threw him into some weeds. Ware stated that he and Harrell then returned to Memphis, first stopping to buy a sundae, and he dropped Harrell off at her mother's house and took K-Von home with him.

According to Ware, three days later, on June 19, he and Harrell went back to Arkansas with K-Von. After traveling through West Memphis, Ware stated that they first turned onto a road with a big S-curve, and then turned down a second road near a generator. Ware then stated that Harrell got out of the car with K-Von and walked around a curve. After a minute or two, Ware followed Harrell and saw K-Von's head bobbing up and down in the water. Four or five days after this initial statement, Ware asked to speak with Officer Ramsey. Ware asked if K-Von's body had been discovered. When told that it had not been found, Ware stated, "Y'all have to keep looking, y'all have to find that child. He deserves a decent burial."

As the investigation proceeded, the State dropped the charges against Harrell, but proceeded with its case against Ware. The State's position during the trial was that Ware committed the murders as an act of revenge against Harrell. Prior to trial, Ware underwent a mental evaluation and was found to be competent to

stand trial. The record reflects that from the beginning of this case Ware refused to cooperate with his court-appointed counsel. The trial court granted a motion by Ware to hire his own investigator, as well as a motion to hire his own psychiatrist to make a determination regarding his competency. Although Ware's expert, Dr. Rebecca Caperton, testified during a pretrial hearing that Ware seemed to be delusional and refused to cooperate in his own defense, the trial court determined that he was fit to proceed to trial.

At trial, the jury heard testimony from Harrell and various law enforcement personnel involved in the investigation. The State also introduced scientific evidence regarding the analysis of the remains discovered at the wooded site. Dr. Cheryl May, a forensic anthropologist with the Arkansas State Crime Lab, testified that the remains, consisting primarily of fragments from the cranium and spine, were human and came from the same individual. Dr. May further stated that some additional human remains, as well as some non-human remains, were discovered at a secondary site about 150 feet away from the initial discovery site. The human remains located at the second site consisted of part of the boney spine, the vertebral arch, and the right ischim, which is part of the pelvis. According to Dr. May, these remains were those of a young child. Dr. May further testified that additional skeletal elements were discovered on a subsequent search of the crime scene. Dr. May stated that these bones were consistent in size, coloration, and age as the previously recovered bones. May opined that the remains were those of a child ranging in age from twelve to sixteen months.

John Stewart, Program Manager of the National Missing Person DNA Database for the FBI, testified that he conducted a mitochondrial DNA test on the bones recovered in this case and compared them to a blood sample taken from Harrell. The test revealed that the bone fragments matched Harrell's blood sample. According to Stewart, Alexander Harrell could not be excluded or eliminated as being the contributor of the bone sample. Stewart further opined that 99.4% of the African-American population could, however, be excluded as a contributor.

Ware also testified at trial and for the first time alleged that Alexander's death was accidental and that K-Von was alive and with a friend. Ware stated that he came home to discover Alexander lying at the bottom of a staircase not moving or breathing. According to Ware, he did not seek medical help out of fear that his other children, Shenna and Perez, would be charged with a crime. Ware recounted how he decided to drive to West Memphis, passing a junkyard and a generator, arriving at a wooded spot where he left Alexander's body in some tall weeds. Ware then stated that he did not tell Harrell what had happened, because she would have retaliated against his other children. Ware further claimed that he had given K-Von to a woman named Cherise DeBarg, whom he had previously met in a grocery store, because he did not want Harrell to take his son away from him. According to Ware, he gave DeBarg his pager number and waited for her to call him about his son. Finally, Ware stated that he had previously told the police and Harrell that the children were dead, because he was angry.

Ware moved for a directed verdict both at the close of the State's case and again at the close of all the evidence. The motions were denied, and the case was submitted to the jury. After returning a verdict of guilty on both counts of capital murder, Ware was sentenced to life imprisonment. This appeal followed.

## I. Corpus Delicti

For his first argument on appeal, Ware contends that the trial court erred in failing to quash the information and later in failing to direct a verdict in his favor, because the State failed to prove the *corpus delicti*. According to Ware, there was insufficient evidence to support either the information or his conviction, because the State failed to produce any proof, other than his own statements, that the children were murdered. Specifically, Ware argues that there was no evidence that the death of Alexander was the result of a criminal act, as the State did not prove the cause of death. As for K-Von, Ware argues that the State failed to prove that a death even occurred or that a criminal act occurred. We disagree.

■ ■ First, Ware is incorrect in asserting that the trial court erred in failing to quash the information. As the State correctly points out, there was no authority for the trial court to grant the motion to quash based on an allegation of insufficient proof. Lack of probable cause is not a statutory ground for a motion to set aside an indictment or, by implication, to quash an information. Ark. Code Ann. § 16-85-706 (1987); *Nance v. State*, 323 Ark. 583, 918 S.W.2d 114, *cert. denied*, 519 U.S. 847 (1996). In *State v. Garrison*, 272 Ark. 470, 615 S.W.2d 371 (1981), this court reversed a trial court's dismissal of an information for insufficient proof, stating that there was no constitutional or statutory authority for a hearing when charges had already been filed by the prosecutor. Here, as in *Garrison*, the charges against Ware had already been filed in the circuit court and the issue of his pretrial detention had been judicially determined. Accordingly, the trial court did not err in denying Ware's motion to quash the information.

■ Likewise, the trial court did not err in denying Ware's motions for directed verdict on the grounds that the State failed to prove the *corpus delicti*, as required to corroborate his statements about the crimes. A motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001). The test on appeal is whether there is substantial evidence to support the verdict. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Where, however, the challenge is limited to the sufficiency of the evidence corroborating a defendant's confession, our review is governed by Ark. Code Ann. § 16-89-111(d) (1987). *See Tinsley v. State*, 338 Ark. 342, 993 S.W.2d 898 (1999). Section 16-89-111(d) provides: "A confession of a defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that the offense was committed." The requirement for other proof is sometimes referred to as the *corpus delicti* rule and requires only proof that the offense occurred and nothing more. *Id.* Thus, the State must prove (1) the existence of an injury or harm constituting a crime and (2) that the injury or harm was caused by someone's criminal activity. *Id.* (citing *Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996)). This court has held that it

is not necessary to establish any further connection between the crime and the particular defendant. *Hart v. State*, 301 Ark. 200, 783 S.W.2d 40 (1990).

In a murder case, this rule requires the State to prove that the deceased came to his death at the hands of another person. *Ferrell*, 325 Ark. 455, 929 S.W.2d 697. This court has recognized, however, that there is no requirement that medical testimony be provided regarding the cause of death. *Sims v. State*, 258 Ark. 940, 530 S.W.2d 182 (1975); *Glover v. State*, 211 Ark. 1002, 204 S.W.2d 373 (1947). Both elements, the fact of death and the cause of death, may be shown by strong and unequivocal circumstantial evidence such as to leave no ground for reasonable doubt; thus, where there is some proof of the *corpus delicti*, its weight and sufficiency is properly left to the jury. *Sims*, 258 Ark. 940, 530 S.W.2d 182 (citing *Edmonds v. State*, 34 Ark. 720 (1879)). *See also Derring v. State*, 273 Ark. 347, 619 S.W.2d 644 (1981).

Here, Appellant led police officers to a remote wooded area near a murky pond in St. Francis County. There, the decomposed remains of the body of Alexander were found. While the body of K-Von was never found, Ware inquired of police if it had been found and pleaded with them to continue looking for it, so that his son could have a proper burial. In addition, when Ware was initially taken into custody, he asked Officers Smallwood and Howard if he could be charged with murder "if they can't find any bodies." Ware also had made veiled comments regarding death and parents who kill their children. These statements combined certainly create circumstantial evidence that both boys had died as the result of a criminal act of another. Moreover, this is not a situation involving victims old enough to disappear, in a secluded area far from their home, of their own accord. The fact that K-Von has never been seen alive after being left in the care of his father is circumstantial evidence of both the fact of his death and Ware's responsibility for that death.

Ware's actions leading up to and following his arrest are also corroborative of his guilt. When contacted by the police regarding the children's whereabouts Ware was evasive and

uncooperative. He also abandoned his home and took his other two children out of state. When police finally caught up with him, Ware attempted to evade detection by giving police a false name and then claiming to have custody of K-Von and Alexander. All of these actions combined could be considered by the jury as corroborative of guilt. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001); *Flowers v. State*, 342 Ark. 45, 25 S.W.3d 422 (2000). Finally, Ware's trial testimony that he gave K-Von to DeBarg conflicted with his prior statements to police that Harrell had killed the boys and that he had witnessed it. This trial testimony is also not credible in light of the fact that when Ware led the police to Blackfish Lake where K-Von was allegedly thrown in by Harrell, he immediately tried to remove his clothes and go into the lake to retrieve his son's body. It is well settled that a defendant's improbable explanations of suspicious circumstances may be admissible as proof of guilt. *Ross*, 346 Ark. 225, 57 S.W.3d 152; *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997).

In sum, the State did establish that Alexander and K-Von were dead as a result of the criminal acts of Ware, thereby proving the *corpus delicti*. Accordingly, the trial court did not err in refusing to grant the motions for directed verdict.

## II. Severance

For his second point on appeal, Ware argues that the trial court erred in refusing to sever the two charges of capital murder. According to Appellant, the charges constituted two separate incidents, and there was no evidence that they were part of a single scheme or plan. The State correctly avers that Ware failed to preserve this argument for review.

Pursuant to Ark. R. Crim. P. 22.1(b), "If a defendant's pretrial motion for severance is overruled, he may renew the motion on the same grounds before or at the close of all of the evidence. Severance is waived by the failure to renew the motion." *See also Gray v. State*, 327 Ark. 113, 937 S.W.2d 639 (1997). Here, a review of the record reveals that Ware failed to renew his motion for a severance at any time during the trial.

Accordingly, his argument on this point was waived, and we will not consider it on appeal.

### III. Competency

Next, Ware argues that the trial court erred in finding him competent to stand trial where he was unable to assist in his defense. In the same vein, Ware argues that the trial court also erred in refusing to grant him a last-minute continuance when he decided to provide his court-appointed counsel with information related to his defense. This court will affirm a finding of fitness to stand trial if there is substantial evidence to support the trial court's finding. *Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1996).

A person lacking the capacity to understand the proceedings against him or to assist in his defense shall not proceed to trial as long as the incapacity endures. Ark. Code Ann. § 5-2-302 (Repl. 1997). A criminal defendant is presumed to be competent, however, and the burden of proving incompetence is on the accused. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001); *Baumgarner v. State*, 316 Ark. 373, 872 S.W.2d 380 (1994). The test for determining an accused's competency to stand trial is whether he is aware of the nature of the proceedings against him and is capable of cooperating effectively with his attorney in the preparation of his defense. *Id.*; *Key*, 325 Ark. 73, 923 S.W.2d 865.

Prior to trial, counsel filed a motion requesting the trial court to find Ware not competent to stand trial. This motion was based on the opinion of Dr. Rebecca Caperton that Ware suffered from a delusional disorder and was unable to assist his attorneys. The State countered Caperton's opinion with that of Dr. Charles Mallory of the Arkansas State Hospital who opined that the only disorder Ware suffered from was antisocial personality disorder. Mallory also testified that Ware scored an eighty-six out of a possible 100 on the Georgia Court Competency Test. According to Mallory, Ware understood the charges against him, as well as the role of the trial judge, prosecutor, and defense counsel. Mallory opined that Ware was competent to participate in the trial process.

■ Moreover, while Ware did consistently refuse to talk with his counsel until the eve of his trial, there was insufficient proof that this lack of cooperation stemmed from any type of mental incapacity. In fact, the record reveals that Ware was knowledgeable of the legal system. At one point, Ware stated in open court that he had instructed his attorneys to file a motion to dismiss. In another instance, Ware wrote a letter to the trial judge seeking new counsel and discussing the nature of judicial proceedings. In light of this evidence, we cannot say that the trial court erred in finding Ware competent to stand trial.

■ Ware further asserts that the trial court should have granted him a continuance to allow him time to prepare a defense consistent with his last-minute admission that Alexander died accidentally and that K-Von was alive. When reviewing the grant or denial of a motion for continuance, this court employs an abuse-of-discretion standard. *Anthony v. State*, 339 Ark. 20, 2 S.W.3d 780 (1999). An appellant must not only demonstrate that the trial court abused its discretion by denying the motion for a continuance, but also show prejudice that amounts to a denial of justice. *Id.* When a motion for continuance is based on a lack of time to prepare, we will consider the totality of the circumstances. *Davis v. State*, 345 Ark. 161, 44 S.W.3d 726 (2001). This court has held that a lack of diligence alone is a sufficient basis to deny a motion for a continuance. *Id; Anthony*, 339 Ark. 20, 2 S.W.3d 780.

■ Considering the totality of the circumstances, it is clear that the trial court properly denied Ware's motion for a continuance. He did not request the continuance until after the eleventh juror had been selected for his trial. Ware was given sufficient time to prepare his defense. In fact, he was granted a court-appointed psychiatrist and investigator to assist him in his defense. Ware knew all along what happened to the children, but chose to wait until the last second to provide his counsel with information necessary to defend him. This is a prime example of lack of diligence and, as such, was a sufficient basis for denying the motion for a continuance.

*IV.* *Pretrial Publicity*

For his final point on appeal, Ware argues that the trial court erred in refusing to exclude all evidence related to the remains of Alexander for violation of a pretrial order limiting publicity. At issue here was a statement made by Officer Ramsey prior to trial that DNA tests confirmed that the previously discovered remains were those of Alexander. As a result of this statement, Ware requested that Ramsey be barred from testifying at trial and that the DNA results be suppressed. According to Ware, the trial court had the authority to fashion a remedy for this violation, but failed to do so. The State asserts that this court should not consider this argument on appeal, as Ware has failed to provide any convincing legal argument or authority in support of this contention. We agree with the State.

This court has said on numerous occasions that it will not consider the merits of an argument if the appellant fails to cite any convincing legal authority in support of that argument. *Bunch v. State*, 344 Ark. 730, 43 S.W.3d 132 (2001); *Ayers v. State*, 334 Ark. 258, 975 S.W.2d 88 (1998). Accordingly, we decline to address the merits of Ware's argument on this point.

*V.* *4-3(h) Review*

The record has been reviewed in this case for other reversible error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.